```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - x
3   THE UNITED STATES OF AMERICA,
                                      Criminal Action No.
4               Plaintiff,           1:21-cr-00050-CRC
                                     Thursday, November 4, 2021
5   vs.                              10:05 a.m.

6   JENNIFER LEIGH RYAN,

7               Defendant.
    - - - - - - - - - - - - - - - x
8
9   _____

               TRANSCRIPT OF SENTENCING
10   HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                UNITED STATES DISTRICT JUDGE
11   _____

12
    APPEARANCES:
13

14  For the United States:    KAREN E. ROCHLIN, ESQ.
                              DOJ-USAO
15                            99 Northeast 4th Street
                              Miami, FL 33132
16                            (305) 961-9234
                              karen.rochlin@usdoj.gov
17

18  For the Defendant:        GUY L. WOMACK, ESQ.
                              GUY L. WOMACK, ATTORNEY AT LAW
19                            609 Heights Blvd.
                              Houston, TX 77007
20                            (713) 224-8815
                              guy.womack@usa.ne
21

22  Court Reporter:           Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
23                            U.S. Courthouse, Room 6718
                              333 Constitution Avenue, NW
24                            Washington, DC  20001
                              (202) 354-3187
25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Good morning, everyone.
 3    We're here for a sentencing in Criminal Case 21-50,
 4    Defendant No. 1, United States of America vs. Jennifer Leigh
 5    Ryan.
 6              Starting with counsel for the government, if you
 7    could please approach the lectern and identify yourself for
 8    the record.
 9              MR. ROCHLIN:  Good morning, Your Honor; Karen
10    Rochlin for the United States, and with me at counsel table
11    is Special Agent Amie Stemen from the Federal Bureau of
12    Investigation.
13              THE COURT:  Good morning, Ms. Rochlin.  You can
14    feel free to remove your mask at the podium, if you're
15    comfortable doing so.
16              MR. ROCHLIN:  Thank you, Your Honor.
17              THE COURT:  All right.
18              MR. WOMACK:  Good morning, Your Honor; Guy Womack
19    for Ms. Ryan.
20              THE COURT:  Good morning, Mr. Womack.  Nice to
21    meet you.
22              Ms. Ryan, good morning.  How are you feeling?
23              THE DEFENDANT:  All right.
24              THE COURT:  All right.
25              MR. WOMACK:  Your Honor, while we're sitting here
```

1     at the table, at counsel table, can we remove our mask as

2     well?  I will be easier to talk.

3                 THE COURT:  You may.

4                 MR. WOMACK:  Thank you, Your Honor.

5                 THE COURTROOM DEPUTY:  When you speak, please make

6     sure you hit the microphone if you're going to speak from

7     counsel table.

8                 MR. WOMACK:  I'm sorry.  I couldn't hear you.

9                 THE COURTROOM DEPUTY:  If you're going to speak

10    from counsel table, make sure your microphone is on.  That's

11    all.  There's a microphone there.

12                Probation, if you can approach the lectern,

13    please.

14                THE PROBATION OFFICER:  Good morning, Your Honor;

15    Crystal Lustig from the probation office.

16                THE COURT:  Good morning, Ms. Lustig.

17                All right.  The Court has reviewed the presentence

18    investigation report, the memoranda submitted by both sides,

19    including the government's supplemental memorandum, the

20    videos cited in the government's memo, and the letter

21    submitted by Ms. Ryan.  Any other written materials for the

22    Court's consideration this morning?

23                MR. ROCHLIN:  Not from the United States, Your

24    Honor.

25                THE COURT:  And will the government be playing any

1    of the video clips this morning, or no?

2            MR. ROCHLIN:  Your Honor, if I can be a little

3    indecisive about that?  It was my original plan, but I may

4    just need to see how things go.  I'm leaning towards not

5    right now, but if I think it would be of assistance, I may

6    change my mind, if the Court will indulge me.

7            THE COURT:  That's up to you.

8            Mr. Womack, any other materials?

9            MR. WOMACK:  No, Your Honor.

10           THE COURT:  All right.

11           All right.  Ms. Ryan, has Mr. Womack reviewed the

12   presentence investigation report with you?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  And are you satisfied with his

15   services in this case?

16           THE DEFENDANT:  Absolutely.

17           THE COURT:  All right.  Just to start with the

18   factual summary of the offense and the defendant's

19   background in the PSR, any objections just to the factual

20   submission in the report?

21           I'll tell you what, you all can just -- you can

22   stay at counsel table and just speak into the microphone

23   from counsel table, okay?

24           MR. ROCHLIN:  Your Honor, the United States has no

25   objections to the final version of the presentence report.

1    THE COURT:  Okay.  Mr. Womack?

2    MR. WOMACK:  No objection, Your Honor.

3    THE COURT:  All right.  Ms. Ryan pled guilty to

4  one count of parading, demonstrating, or picketing in the

5  Capitol Building in violation of 40 USC 5104(e)(2)(G).  That

6  statute authorizes the Court to impose a term of

7  imprisonment of up to six months and a fine up to a maximum

8  of $5,000.  The statute does not authorize a term of

9  supervised release.

10    Pursuant to the plea agreement, the defendant has

11 agreed to pay restitution in the amount of $500 to the

12 Architect of the Capitol to help compensate for the damage

13 to the Capitol.  The offense is a Class B misdemeanor so the

14 federal sentencing guidelines do not apply.

15    Any objections?  Did I get that right, Counsel?

16    MR. ROCHLIN:  You did, Your Honor.

17    THE COURT:  Okay.  Mr. Womack --

18    MR. WOMACK:  Yes, Your Honor.

19    THE COURT:  -- any objections?

20    All right.  We've received a recommendation from

21 the probation office of a sentence of 24 months probation as

22 well as the $500 restitution payment.

23    Would the government like to address the 3553(a)

24 factors?

25    MR. ROCHLIN:  Yes, Your Honor.  Thank you.

1          Your Honor, I will try not to replow what I said

2     in the government's sentencing memorandum.  There are a few

3     things I will try to emphasize as briefly as I can.

4          The first is the unprecedented nature of what

5     happened on January 6th at the Capitol.  While I don't

6     want to belabor it, I do think it is important to note that

7     the facts of this offense -- I am not aware of anything

8     remotely similar in any other jurisdiction or in the recent

9     history of the United States where an angry mob breached the

10    Capitol with the intent of disrupting or overturning the

11    certification of the 2020 Presidential Election. There were

12    multitudes of people on the Capitol grounds and who entered

13    the Capitol.  Not all of them were alike, and that is

14    something that I am going to be focusing on as my remarks

15    continue.

16          I'm sure the Court has seen a lot about that day

17    so I won't belabor the specific details of what happened

18    where moment by moment, but regardless of how any individual

19    defendant has been charged, this was a serious event.  It

20    was a violent event.  It set in motion other events that

21    caused injury and loss of life and what many believe to be a

22    continuing injury to our democratic process, and I think

23    that is something that should be on one's mind when it comes

24    to evaluating the facts of this case.

25          The next thing I would like to emphasize, which is

1      touched on in the government's papers, is the fact that this

2      case is not about the First Amendment.  This is not about

3      prosecuting people for any belief that any individual holds

4      regardless of what that belief may be or which side of the

5      political line it lands.

6              The First Amendment is not unrestricted.  One can

7      famously not yell "fire" in a crowded theater when there is

8      no fire.  One cannot use the First Amendment to make

9      threats, to conspire, to commit a crime, to cause others to

10     commit injury.  There are -- or to defame, as this defendant

11     certainly recognizes having filed a defamation suit, which

12     she prevailed in.  Words in many contexts have consequences,

13     and the First Amendment is not an exit ramp from

14     accountability.

15             The United States is not prosecuting every single

16     individual who has a particular political point of view

17     associated with the events on January 6th.  We are

18     prosecuting people who broke the law based on evidence to

19     support that conclusion.  And it is in that context that we

20     ask the Court to impose a sentence on this particular

21     defendant based on the evidence that addresses not just the

22     offense, but what she did leading up to the offense, during

23     the offense, following the offense as part of her particular

24     history and characteristics, because those actions are one

25     part of a larger picture showing the serious nature of the

1   offense.

2          So when the United States focuses on statements of

3   the defendant, we do not contest the defendant's right or

4   the right of any individual to make certain statements.

5   Part of what we are saying is that the remarks, the social

6   media posts, the recordings that the United States has

7   referenced in its memorandum provide a window into the mind

8   of the person who made those statements and signify part of

9   what the ongoing offense of January 6th was all about.

10          THE COURT:  So the government has obviously

11   focused on many of Ms. Ryan's social media postings and

12   media interviews after January 6th.  She's obviously free to

13   make all of those statements.  The government argues that it

14   shows a lack of a true acceptance of responsibility and

15   remorse, and I guess my question is, what is the

16   relationship between those statements temporally and her

17   guilty plea?

18          She has now pled guilty and has accepted

19   responsibility, at least for the elements of that criminal

20   offense.  How should the Court view her prior social media

21   and media statements now that she has pled guilty and

22   accepted responsibility for that offense?

23          MR. ROCHLIN:  I apologize for the beeping, Your

24   Honor.  That was my computer shutting down, and I think I'm

25   going to give up on the technical aspect of my presentation

1    for today.

2         Your Honor, I think the Court should take those

3    statements into consideration for a number of reasons.

4    First, because it is true, and the government has

5    acknowledged that, yes, the defendant has pled guilty, and

6    she has, in what the government would consider to be a

7    limited fashion, accepted responsibility for what she has

8    done.

9         As I read the proffer supporting her plea

10   agreement and the statements of the defendant that were made

11   to probation and in her most recent letter to the Court, she

12   is acknowledging responsibility for her physical presence

13   inside of the United States Capitol.  What I don't see

14   acknowledgement of is the full context of the offense and

15   the rest of what she did; and so, therefore, the United

16   States feels it is appropriate to question the extent of

17   that acceptance, whether it is complete and whether -- I

18   think acceptance can be one thing, an admission of what one

19   has done and an acknowledgement of that fact.  And remorse

20   for what one -- for the conduct one is accepting is perhaps

21   a related but separate issue.  And the government, certain

22   protestations notwithstanding, does not see remorse.

23        So the statements that the government has

24   presented to the Court through its memorandum and through

25   the recordings themselves were made before the defendant's

1    plea of guilty.  I cannot point the Court to a -- well, I

2    cannot point the Court to a particular recording that has

3    occurred after the guilty plea.  I can point the Court to

4    the letter the defendant has written, which in many respects

5    the United States finds somewhat troubling and not fully

6    truthful.  And I would suggest to the Court that one way to

7    view acceptance is, if you'll allow me a metaphor that is

8    somewhat trite, to view it as something of a bubble.

9    Untruths relating to the offense may be something that

10    bursts that bubble.  So while there has been some acceptance

11    post-offense, when the defendant has been identified and

12    charged and is facing consequences, it can also be viewed in

13    that context.

14           THE COURT:  What in her letter is untrue?

15           MR. ROCHLIN:  Your Honor, the defendant insists,

16    for example, that she had no knowledge that there was

17    violence at the Capitol when she went there, and the United

18    States, or at least this prosecutor, simply cannot fathom

19    how that can be true given the evidence that the United

20    States has seen and discussed.

21           One of the reasons why we distinguish Ms. Ryan's

22    case from others is, first, because she went to the Capitol

23    not directly from the rally she attended not knowing what

24    was happening at the Capitol or would occur in the future

25    upon her arrival, but after she got back to her hotel room,

1    after she observed a news broadcast reporting that people

2    were, quote, climbing the walls at the Capitol.  She

3    recorded herself in parts of that broadcast and knew and saw

4    that people were climbing up the western side of the

5    building at the what I assume is the lower west terrace,

6    since that's easier to climb up towards the area of the

7    scaffolding on that side of the Capitol.  There is, in the

8    recording, very quickly, some visual about the interaction

9    between the climbers and the police, and no right-thinking

10   person at the very least, and giving the defendant every

11   benefit of the doubt, could think that this was a normal way

12   to enter the Capitol, a proper way to enter the Capitol, a

13   peaceful way to enter the Capitol.

14          The defendant had that knowledge; that in effect

15   there was a mob at the Capitol; that there was a riot at the

16   Capitol; that people were not supposed to be at the Capitol;

17   and that is reinforced by a message the defendant received

18   that the United States has also referenced where there was a

19   forwarded text from a commentator describing, in his words

20   that I'm slightly paraphrasing, every barrier to the Capitol

21   has been breached.

22          THE COURT:  I saw that.  One question.  Who sent

23   her that Tweet?  Did that come from one of her co-defendants

24   in this case?

25          MR. ROCHLIN:  Your Honor, it came from a member in

1     the group that she traveled with, that she attended the

2     rally with, who has not been charged, and that is why the

3     United States has not identified that individual by name.

4                THE COURT:  The group was larger than the two co-

5     defendants and the defendant?

6                MR. ROCHLIN:  Yes, Your Honor.  There were two

7     additional individuals.

8                THE COURT:  Very well.  And were they all staying

9     at the same hotel?

10               MR. ROCHLIN:  Honestly, Your Honor, I don't have

11    direct knowledge if they were all staying at the same hotel.

12    I know the defendant and two others were.  And my assumption

13    is they were all staying at the same hotel, but I truly do

14    not want to say that without having something concrete that

15    I can point to.

16               THE COURT:  Very well.

17               MR. ROCHLIN:  So from the perspective of the

18    United States, Ms. Ryan had an off ramp.  She had good

19    reason not to go to the Capitol at all because there were

20    broadcasts of a riot, because while she was still in her

21    hotel room, based on the time stamp for the message, she

22    knew that police were overrun.  I think any rational adult

23    person would conclude that if police are being overrun it's

24    because they don't want you going where you're running.  She

25    went to the Capitol notwithstanding any of that.

1          She did arrive after a good part of the mob that

2    was engaging in the assault on the Capitol, and it is

3    entirely possible, when she approached the building from the

4    east side, that what she saw from her perspective on the

5    outside in that moment was not violent, was simply a group

6    of people in an area that she had every reason to know no

7    people were supposed to be.

8          THE COURT:  All right.  She passed a broken window

9    when she went in.

10          MR. ROCHLIN:  She passed a broken window, Your

11   Honor.  She passed through the sound of audible alarms.  She

12   passed people streaming out of the building.  And there is

13   at least one audible comment from somebody else referring to

14   pepper spray as people are streaming out and the defendant

15   is entering, and the defendant herself makes comment --

16   makes a comment as she enters and after she enters about

17   tear gas inside of the Capitol, and she's, from the sound of

18   it, concerned because she doesn't have goggles, and she

19   doesn't want to encounter the chemical irritants that the

20   police are deploying.

21          All of those things, Your Honor, again, I submit,

22   are clear indications that this is not someplace where it is

23   lawful or appropriate to be.

24          We also acknowledge that the defendant was not

25   inside the Capitol for a great length of time, although I'm

1    not sure in this context it's the best or strongest or most

2    accurate indicator of culpability because the reason that

3    the defendant herself gives for exiting when she did is,

4    again, because of the chemical irritants.  It's not because

5    she's overcome with remorse about being in the Capitol.

6    It's not because she recognizes that it's wrong for her to

7    be there.  She is uncomfortable there, and --

8         THE COURT:  Well, she's indicated otherwise in

9    other contexts.  She says she didn't feel comfortable.

10   She --

11        MR. ROCHLIN:  She didn't feel comfortable because

12   of the crowd, which, again, is not a recognition of the

13   impropriety of her presence.  It is not a recognition that

14   what she's doing is wrong.  It is not a recognition or any

15   kind of acknowledgement that the police are trying to make

16   the people who were there go away.  Most of her statements

17   in real time and even after the fact, in later Tweets and

18   other communications apart from the presence of the crowd,

19   reflect that the defendant left because of tear gas.

20        And when she left, Your Honor -- and this is

21   another distinguishing factor for the United States -- she

22   didn't go back to her hotel.  She didn't go to some other

23   part of the city.  She remained on the Capitol grounds, and

24   I would submit to the Court it is appropriate to consider

25   that conduct as well in evaluating the 3553(a) factors and

1    what sentence is appropriate in this case.

2              THE COURT:  And I reviewed a number of videos

3    yesterday, including the destruction of some of the media's

4    property outside of the Capitol, and the defendant is

5    pictured in that scrum of people.  That was after she

6    entered and left; am I correct?

7              MR. ROCHLIN:  As best I can place things on the

8    timeline, Your Honor, yes, that is my understanding; that

9    this was after she had left the Capitol, and she and one of

10   her co-defendants encountered the crowd at what was an

11   outdoor media enclosure.  And the Court has seen what

12   happened and the results.

13             THE COURT:  Okay.  And the GoPro video that you

14   submitted, that was for the purpose of establishing her

15   presence at that media enclosure; is that right?

16             MR. ROCHLIN:  In the GoPro video, Your Honor,

17   that was for the purpose of establishing what happened

18   at the enclosure.  Ms. Ryan's co-defendant does appear

19   briefly in that video at about five minutes and 30 seconds

20   in, give or take a few seconds, and the photograph shows

21   that Ms. Ryan was there observing as well, in a photograph

22   with her co-defendant, as somebody appears to be actively

23   taking it looks like a pole or a flag and jamming it into

24   equipment.  So, yes, that is one of the events that occurred

25   after Ms. Ryan left the interior of the Capitol.

1           Other recordings that the United States feels it

2      can place after Ms. Ryan's exit from the Capitol include a

3      recording of a crowd that -- you know, notwithstanding the

4      fact that people have come out, there is a crowd that is

5      trying to go in.  And Ms. Ryan is recording that, and she is

6      shouting, "We are pushing our way in."  So even after her

7      own exit she seems to be encouraging, promoting, endorsing,

8      if you will, the effort of the crowd to push its way in, to

9      force its way in.

10           She, at one point, as she herself has explained to

11     the Court, is standing on the steps.  She is preaching to

12     the crowd.  The United States, by referring to this, does

13     not in any way mean to criticize Ms. Ryan for preaching to

14     the crowd that was assembled, but she allows herself to be

15     interrupted by someone who approaches her to report that a

16     window is being broken, and she should film it, which she

17     immediately proceeds to try and do.

18           She goes over to the window.  She is shouting

19     slogans.  She refers to the -- she refers to Senator Mitch

20     McConnell in a disparaging way.  She approaches the window.

21     She films it.  By the time she gets to this particular

22     window the people who have damaged it have already finished

23     that particular job, and I can't tell the Court with any

24     accuracy that they're even in the video, but it appears to

25     be the same window that the defendant photographs and Tweets

1    with a caption saying that they're coming for the news media

2    next.

3              THE COURT:  You say in your memo that she joined

4    in the "Hang Mike Pence" chant.  I looked for that in the

5    video and did not see it.  Is that in the video, or no?

6              MR. ROCHLIN:  My recollection is that it is in the

7    video, Your Honor, and my notes reflect that as well, and I

8    am -- I strive for accuracy, Your Honor.  I am not going to

9    rule out the fact that I could have misinterpreted or

10   misheard.  I think the video should speak for itself.

11             I do believe it is still potent evidence, the fact

12   that the defendant, who to this day says she has no

13   knowledge of violence, that she didn't witness any

14   violence -- which seems to be contradicted by the evidence

15   the government has presented -- is, again, present for a

16   chant where the crowd is shouting "Hang Mike Pence."  That

17   has relevance even if the defendant did not join in with

18   that.  But she joined in with plenty of other chants that

19   I'll refrain from repeating at this moment unless the Court

20   requests.

21             The other kind of stand-out video for the United

22   States is when the defendant acknowledges hearing -- I am

23   not assuming it's the same window as the one in the Tweet or

24   the one she was asked to film, but she announces that she

25   hears windows being broken.  And this is at the same time or

1    in the same recording, at least, where knowledge that

2    somebody inside the Capitol, a woman, has been shot with

3    what the defendant refers to as a real bullet, and in that

4    recording you can hear members of the crowd in the

5    background referring to the fact that someone has been shot.

6    The defendant makes note of that in her self-recording, and

7    then she comments on the sound that windows are being

8    broken.

9          She says this is the start of a war, returning to

10   a theme that she has been presenting since approximately

11   7:00 a.m. that morning; that what is happening on January

12   6th, even before anybody has gone to the Capitol, even

13   before there's a mob at the Capitol, that this day is a

14   prelude to war, to paraphrase some of her phrasing.  And she

15   comments as well in the aftermath of the reference to the

16   beginning of a war and the breaking of windows essentially

17   "What do you expect to happen?" and "The military isn't

18   going to come," and "Really, we could go in there."

19         And all of this is being not simply said in

20   apparent endorsement and approval of the events taking

21   place.  These things are being recorded and broadcast.  And

22   many of the recordings the United States has presented in

23   this case I can say with almost near certainty were

24   broadcast on social media because that's how the United

25   States found them.  We recovered them from social media.

1    Other recordings were in her phone.

2            But the purpose was clearly to broadcast, to

3    disseminate.  And I don't think this was meant to occur in

4    an objective way.  I don't think this was meant to be

5    presented as criticism of what was happening.  This is

6    someone who said we are going to storm the Capitol, and that

7    is why we came here.  This is someone who was advocating to

8    stop the steal.  This is someone who was encouraging others

9    to get on their planes.  This is someone who said in one

10   recording it's not just about me, it's about all of you, and

11   it wouldn't be just me confronting tear gas, breaking

12   windows.

13           Again, I'm not quoting exactly word for word, but

14   that's the sense of what she says.

15           And this is someone who isn't your Average Joe,

16   Your Honor.  This is someone with a significant social media

17   following.  This is someone who can take a picture of a

18   broken window, and it will get, rounding upwards a little

19   bit, a quarter of a million likes.

20           So the United States, I would suggest, is

21   rightfully concerned not that this defendant engaged in

22   violence hands on, but that through approving it, through

23   broadcasting it, through, in effect, inciting it, there is a

24   risk in the future, if there are similar setbacks for her

25   political objectives or the objectives of those she joins,

1    that there could be additional violence at some other state

2    house or in this city or wherever some other mob decides it

3    is appropriate to react in that fashion.

4         This is something that concerns the United States,

5    especially when the defendant appears to be in a state of

6    denial about her own conduct and has said so frequently;

7    that she is a martyr; that she deserves a medal; that what

8    she did was noble; that what she did was an act of duty.

9         THE COURT:  The Justice Department has the

10    difficult task of trying to distinguish between the hundreds

11    of defendants in these cases -- I think the latest count is

12    upwards of 700 -- both in its charging decisions and in its

13    sentencing recommendations.  I know that it is not a

14    science, but give me a sense as to why the department has

15    come up with the recommendation it has made in this

16    particular case.

17         Why not probation?  Why not three months?  Why not

18    six months?  Why the two-month recommendation, to the extent

19    that you can flesh that out?

20         MR. ROCHLIN:  It is an art, Your Honor, but let me

21    try and give you a sense of some of the factors the United

22    States has considered in assessing this defendant.

23         First of all is the fact that in effect she was

24    drawn to the riot, unlike many others, all right.  She can't

25    say that she walked from the rally directly to the Capitol

1    with a large group of people that became a mob and how could

2    anybody possibly know what would transpire?  She saw what

3    was happening in a news broadcast, and she went to the riot.

4         Other defendants for whom in some cases the United

5    States has also recommended incarceration -- and in this

6    respect I would submit they are not as bad as the

7    defendant -- include the defendant in the *Griffith* case, the

8    *Mazzoco* case, and the *Gallagher* case.  This defendant went

9    to the riot, and that is significant in the view of the

10   United States, Your Honor.

11        Other defendants -- this defendant argues that to

12   some extent she has engaged in an effort at cooperation.  I

13   would point out to the Court, while we don't fault what

14   cooperation the defendant has provided, for example, by

15   turning over passwords for certain devices, the defendant

16   did not make those devices available, as is written in her

17   memorandum and as she acknowledges in the *Today* show

18   recording, and it's simply a fact.  The United States

19   executed search warrants to obtain her computers and her

20   phone.

21        So I would suggest to the Court in that respect

22   this is not fully making devices available.  This is the

23   United States went and, under lawful authority, procured

24   them, and so that is something that may distinguish this

25   defendant from others.

1          Other defendants have certainly cooperated more

2     fully.  As one example on the cooperative side of the

3     spectrum that exceeds anything this defendant has done, I

4     can point the Court to the case of a defendant named Eliel

5     Rosa, Case No. 21-CR-68, who appeared -- whose case was

6     assigned to Judge McFadden, and approximately two days after

7     January 6th, two or three days, Your Honor -- he wasn't even

8     a suspect -- he self-reported to the FBI and turned himself

9     in.  The level of cooperation here is certainly not at that

10    level, and I don't know that that weighs strongly in favor

11    of a lower sentence as opposed to a higher one.

12          THE COURT:  And am I correct to conclude that

13    there is some coordination within the department to

14    distinguish between defendants, to make sure that there are

15    not undue disparities in the recommendations that the

16    government is making in all of these cases?

17          MR. ROCHLIN:  Absolutely, Your Honor.  There is a

18    very dedicated effort.  I consider it to be thorough and

19    painstaking, if the Court will indulge me in expressing one

20    prosecutor's opinion, but there is certainly a process.

21    There are efforts to list and compare and contrast the

22    different cases in the process of arriving at a

23    recommendation.

24          There are other factors that make this defendant

25    stand out from various others, including defendants who, on

1    different timelines, immediately expressed remorse and

2    contrition and regret for what they had done.  That is not

3    something that happened in this case, and in its papers the

4    United States has cited the comments of your colleagues on

5    the bench who have reviewed expressions of remorse with some

6    skepticism and have decided to attach less weight to such

7    expressions when they have been after the fact, so to speak;

8    after getting caught, after a plea of guilty, when

9    confronting sentencing, at a point in time when there is

10    self-interest in making such expressions of remorse as

11    opposed to -- even when genuine.  I think the *Mazzoco* case

12    is one example of that, and I believe that's the one we

13    cited in our papers.

14         What the defendant said at the time of the ongoing

15    riot on January 6th is also striking to the United States

16    because, in the view of the government, this was -- this

17    defendant was an individual advocating violence, even if she

18    did not participate in such violence herself.  She endorsed

19    it.  She celebrated it.  She promoted it.  She broadcast it.

20    She broadcast it in such a way that no one could possibly

21    think, as she stands next to a broken window and says we're

22    coming for the news media next, that this was a disincentive

23    to act violently.

24         It was the opposite, and it was done by someone

25    who has every reason to know that words matter and have

1    consequences and every reason to think that she had

2    influence over others because that is what she did.  That is

3    what she intended to have over various social platforms.

4    She wanted people to follow her.

5         And I know she disputes that she wasn't asking

6    people to follow her in the sense of urging them to

7    violence, but the government treats many of her remarks with

8    skepticism partly because they appear to have changed over

9    time.  This is someone who said she didn't go into the

10   Capitol at all, and then she was at the door frame, and then

11   she was in there for two minutes, which happens to be the

12   truth, the last part.

13        But these are not signs of credibility, Your

14   Honor.  This is a defendant who began that morning by

15   speaking of a prelude to war, who indicated that she would

16   be willing to essentially lay down her life to enter the

17   United States Capitol on January 6th because it was that

18   important to her.

19        And when pressed on that point, because the

20   logical assumption is if one is laying down one's life one

21   expects to encounter violence, in an interview the defendant

22   explains that she didn't mean she would be fighting.  She

23   was referring to essentially that if somebody shot her it

24   would be worth it.  Again, I'm paraphrasing somewhat, but I

25   think that's a fair rendition of the import of her

1     statement.

2              And then now, in her letter, she claims the war

3     she was talking about was an information war, and no

4     violence was intended.  And I think that evolution sends a

5     clear signal that there is a lack of credibility in these

6     explanations, which are situational and designed to deflect

7     the true intent that happened in the moment of the events of

8     January 6th because, Your Honor, one doesn't lay down one's

9     life when conducting an information war, and people

10    generally, as this defendant expressed, don't, quote, freak

11    out because they are about to go to war, which was in one of

12    the video clips that the government presented.

13             THE COURT:  Okay.

14             MR. ROCHLIN:  So given this broadcasting, given

15    this advocacy for violence, the United States puts the

16    defendant in a separate category.

17             Another factor, if the Court will bear with me,

18    that distinguishes this defendant is what the government

19    views as her dishonesty.  Again, coming back to the claim

20    that she did not know that a riot was taking place, which

21    was said to probation, which was repeated even more strongly

22    in her letter, that she didn't witness any violence, I think

23    the evidence shows pretty clearly that she did.  She heard

24    windows breaking.  She was told someone was destroying a

25    window and went to film it.  She seemed to think that she

1    was in a situation where the military could come but wasn't

2    going to on this particular day.  She saw what happened at

3    the media enclosure.  Yet she emphasizes to probation,

4    literally to this Court, that she did not know of any

5    violence, and her letter states she did not witness or

6    observe or participate in violence.

7           Well, the United States will grant she didn't

8    commit violence hands on, but in some sense, as an observer

9    and an encourager, she did participate, and she certainly

10   witnessed and observed and then transmitted the violence of

11   that day.

12          All of these factors, coupled with a lack of

13   remorse, coupled with some concern that the defendant may

14   seek to do this again, make the United States conclude that

15   its sentencing recommendation is appropriate.

16          And, again, in anticipation of First Amendment

17   arguments, Your Honor, the defendant cannot use the First

18   Amendment to incite.  The defendant cannot use the First

19   Amendment to further unlawful conduct, and it is not

20   something that strips one of accountability for one's own

21   actions.

22          THE COURT:  Great.  Thank you.

23          Mr. Womack.

24          MR. WOMACK:  Thank you, Your Honor.

25          Your Honor, I agree with what the government said.

1    This case is not about the First Amendment.  And the

2    government said that in the very first comment, and then for

3    43 minutes all they talked about was the First Amendment.

4              THE COURT:  Well, Counsel, you have spent a lot of

5    time in your memo, and the defendant has in her letter,

6    talking about the First Amendment.

7              MR. WOMACK:  Absolutely, Your Honor.  We're trying

8    to defend it, and I'm doing that again today.

9              Your Honor asked the government during their

10   speech, if you will, was anything that Ms. Ryan said not

11   protected by the First Amendment, and they conceded, yes, of

12   course it was protected.

13             She's not here for inciting violence; she didn't

14   do that.  She's not here for encouraging people to commit

15   violence or destruction; she didn't do that.  Her acts,

16   which is what she's charged with and what she pled guilty

17   to, are that on January 6th of this year she and some

18   friends of hers had flown out here from Dallas, Texas, on a

19   private jet to go to a party, a celebration of American

20   freedom.

21             She went to the rally by President Trump the

22   morning of January 6th.  She was full of patriotic vim and

23   vigor and fervor, but she went back to her hotel.  No

24   intentions of going to the Capitol.  You know, that wasn't

25   part of the plan.  But once back at the hotel her friends

1   were watching TV.  She wanted to go take a nap, and they

2   said, "Hey, people are in the Capitol.  Why don't we go down

3   there."

4           She didn't see any violence.  There wasn't any

5   violence that she would have known of, and so they went back

6   to the Capitol --

7           THE COURT:  She didn't get the text with the folks

8   scaling the walls of the Capitol or watch the --

9           MR. WOMACK:  I don't consider that violent.  It's

10  stupid.  It's dangerous.  You can fall and hurt yourself.  I

11  think it would be wrong to be climbing up there even --

12          THE COURT:  You don't think that act would elicit

13  violence on behalf of -- by the police who were trying to

14  defend the Capitol?

15          MR. WOMACK:  Well, I haven't seen pictures of the

16  police doing anything other than standing there, but if they

17  were fighting police, that's illegal.  If they were hitting

18  police, yelling at police, I think that's wrong.

19          Climbing the Capitol, I think it's stupid, but I

20  wouldn't say it was violent, if they're just climbing the

21  Capitol.

22          But it doesn't matter how I interpret it.  The

23  fact is she didn't do that.

24          THE COURT:  Was it peaceful?  Would you

25  characterize that as peaceful protest?

1          MR. WOMACK:  I wouldn't, Your Honor.  I think it's

2    stupid, and a lot of things they did were stupid.

3          But she didn't participate in any of that.  If she

4    saw people climbing up the Capitol, I mean, that was silly.

5          But she went back down there with her friends.

6    She did not push aside barriers.  She didn't push police out

7    of the way.  She walked into the Capitol with a crowd.  She

8    stood -- and the video shows this.  The government can see

9    this.  She was in the Capitol for about two minutes, and she

10   was never as far away from the door as I am to the bench.

11   She was within eight or ten feet at all times at most.

12         Police officers were sitting nearby.  She greeted

13   them.  They said hello.  No one said, "Don't come in here,

14   darling.  Get out of here."  Nothing like that.

15         She was standing among the crowd.  She walked out.

16   She did not see a broken window going in, but she did see

17   the broken window when she came back out.

18         Remember, she probably came out a different side

19   of the crowd.  The crowd was going in on the right.  It was,

20   I guess, coming out on the left.  When she came back out,

21   you know, she saw the window.  She took a picture standing

22   in front of it, and she made comments afterwards about what

23   a great time it was.  She was glad she went.

24         Again, in her mind, she was -- this was the kind

25   of experience that she'd had in Texas at a demonstration;

1   the only demonstration she'd ever been to before this.  They

2   were protesting something there in Texas, and she and a

3   group walked around the Texas Capitol -- a copy of the

4   nation's Capitol, by the way -- and she walked around that.

5   And there was no destruction, no violence.  No one was

6   arrested.  It was a completely peaceful demonstration.

7   That's the only demonstration she'd ever been to in her

8   life.  It was a good experience.

9           So she came up here on this private jet.  She

10  walked in with her friends.  She stood in the Capitol for

11  two minutes.  She doesn't know what pepper spray smells like

12  or tear gas, but she said it stunk inside the building.

13          THE COURT:  Isn't it fair to assume that she left

14  because that tear gas hit her, not because she had second

15  thoughts?

16          MR. WOMACK:  No, Your Honor, it's not.

17          THE COURT:  Why not?

18          MR. WOMACK:  She wasn't hit by -- there is no

19  evidence at all, no suggestion in photographs, that her eyes

20  were watering.

21          I don't know if Your Honor has a military

22  background or not.  I'm a retired lieutenant colonel of the

23  Marines.  I've been in tear gas chambers half a dozen times.

24          THE COURT:  Well, I meant that metaphorically.

25  She clearly experienced the tear gas.  She said, "I don't

1     have goggles."  She didn't like it.  Is that why she left,

2     or did she leave for another reason?

3                MR. WOMACK:  She left because -- she says it in

4     the video.  "I have nothing to do here."

5                THE COURT:  Okay.

6                MR. WOMACK:  She had no business being in there so

7     she left, and if she had been close enough to tear gas or --

8     I don't know about pepper spray.  If she'd been near tear

9     gas, all of the fluid in her eyes and nose would be running.

10    She'd be a mess.  Make-up would be washed off.  It would be

11    a complete mess.  Physically you would see it.  So she

12    wasn't close enough to anything like that.  But she left.

13               And, again, she left.  She didn't go further in.

14    She didn't go try to find what was going on.  She said, "I

15    have no business being here."  She walked out.

16               She took a picture of the broken window that had

17    already been broken apparently.  She didn't see it broken.

18    Nothing illegal about that.  We've probably taken pictures

19    of car wrecks or fires or other things that have happened.

20    She did nothing more than that.

21               The comment, which is what the government is

22    trying to punish her for, is that she was boasting about

23    this.  She is a social butterfly.  You know, she goes on the

24    Internet and posts things, and she's saying, "Oh, it was a

25    great day.  I'm glad I was there."  And she was there.

1    And I think she ended up getting an attorney like

2    immediately after she was encountered by the FBI, not me,

3    and the attorney was saying, "Hey, you know, you should go

4    to the press and say President Trump told you to do this,"

5    but that was a lie.  But she did agree to some interview and

6    said the things that she said in the interview.  That was

7    within days or a week or so of when the event happened.

8         In February, after she had encountered the FBI,

9    she hired me, and of course I said, "Knock off all that

10   stuff.  We don't need that.  I don't want Your Honor hearing

11   that kind of stuff."  She's done nothing like that since

12   then.

13        Let's go over what happened that day.  She goes

14   back --

15        THE COURT:  Let's focus on the statements.  We

16   both know what they are.  You've made the point in your memo

17   that, you know, they're protected speech.  I agree with

18   that.

19        MR. WOMACK:  And it is.

20        THE COURT:  She's perfectly entitled to have said

21   what she said, but you would agree that I can still consider

22   those statements for purposes of sentencing when I think

23   about, you know, deterrence and acceptance of responsibility

24   and true remorse and respect for the law.  Those are all

25   legitimate purposes of sentencing, correct?

1          MR. WOMACK:  I would agree.  I would agree.

2          THE COURT:  Okay.  So you're not saying I

3   shouldn't consider them.  You're just saying that she was

4   entitled to make them, right?

5          MR. WOMACK:  Exactly.

6          THE COURT:  All right.

7          MR. WOMACK:  And Your Honor can also consider

8   the fact that since -- well, beginning immediately when she

9   was -- when the FBI came to see her, she gave them her cell

10  phone.  They didn't have to show her a warrant.  She gave it

11  to them.  She gave them the password that protects her cell

12  phone.  She gave them her computer, laptop, also other

13  equipment, which the government has I think it was two weeks

14  ago returned to her finally.

15          But she gave them that.  She gave them the

16  passwords.  She gave up all of that stuff so they could look

17  at it.  She told them what website she uses or what, you

18  know, podcasts and blogs she participates in or watches,

19  what news programs she watches.  She told them all about

20  that.

21          Very importantly, when she first hired me, I was

22  not then admitted to the District of Columbia.  I belong to

23  20 other federal districts, but not this one.  So I

24  submitted my application, and it took weeks and weeks to

25  finally get admitted.  I think it was March 3rd or something

1    before I was admitted to this Honorable Court.  But during

2    those two or three weeks I was applying for admission, I was

3    busy talking to Frances Blake.

4            Frances Blake is an Assistant U.S. Attorney for

5    the Southern District of Texas in the McAllen Division.  She

6    was the originally prosecutor on the case.  Ms. Rochlin

7    joined the case almost a month ago, October 5th, according

8    to her appearance.

9            From the very first conversation with Frances

10   Blake Ms. Ryan was offering to plead guilty.  She felt

11   terrible about what she had done.  She realizes this wasn't

12   just something fun or something that was celebrating

13   President Trump.  This was wrong, to go into the Capitol,

14   even to demonstrate by standing there for two minutes.

15           And so she was wanting to plead guilty, and I

16   related that to the government.  I said, "She's also willing

17   to come in and make a proffer.  She'll tell you what

18   everybody else did that she knows.  There's only a handful

19   of people there that she knew, but she'll tell you all of

20   that."

21           The government didn't take part of that.  They

22   said, "Well, we'll wait until we develop the case and get

23   you some more evidence to look at, more discovery."  But

24   from literally I think it was 18 February of this year

25   Ms. Ryan was attempting to plead guilty in this case and was

1    telling the government that.

2          Ms. Blake said, "Well, I can't make the decision.

3    This is coming out of Washington."  And she started

4    contacting her superiors, whoever that is, and the date that

5    she -- that Ms. Ryan pled guilty, and I forget what it is

6    now, that was the very first date available after they gave

7    her a plea agreement.

8          As soon as they finally came up with a plea

9    agreement that we'd been talking about for months, we

10   contacted the Court.  We tried to schedule the plea for

11   immediately, and they did it August, I guess.  I forget when

12   it was.  But that was the first available date that we could

13   get after she got a plea agreement.  But she was asking for

14   that plea agreement back in February before I was even

15   admitted to the District.

16         As late as two weeks ago or one week ago I talked

17   to Ms. Rochlin.  She had called me, graciously, and told me

18   she was filing her memorandum.  I was at a restaurant

19   somewhere on another case, and I told her that the offer

20   still stands.  Ms. Ryan has always offered to meet with the

21   government and talk to them, and no one's taken advantage of

22   that, but it exists today.  She's always been willing to do

23   that.  And Ms. Rochlin said, "Well, we're not sure if we

24   want to talk to her," and they had valid reasons.  They may

25   or may not want to.  I'm a former AUSA.  I understand her

1    position.

2            THE COURT:  So, Counsel, the point is that her

3    decision to plead guilty was earlier than might be inferred

4    from just the docket given the timing?

5            MR. WOMACK:  It was in February.  Yes, Your Honor.

6            THE COURT:  And after she decided to plead guilty

7    in February, did she then go on all those news shows?

8            MR. WOMACK:  I'm sorry, what?

9            THE COURT:  After she decided to plead guilty in

10   February, did she then go on all those news shows and send

11   out all these Tweets, or those were all before that?

12           MR. WOMACK:  They were before that, Your Honor.

13   And she's been nothing but remorseful because she realizes

14   what she thought was protected, to the extent that she was

15   involved, really was wrong, and she should have known that

16   then.

17           And she came in here and said, "Yes, I did

18   demonstrate inside the Capitol by being in there," and she

19   chanted, you know, "USA, USA."  She is on video making a

20   biblical quote invoking Jesus's name.  She wasn't saying,

21   "Let's burn this" -- "Let's break the place down."  She was

22   not part of any insurrection or anything violent, and

23   watching something happen as -- keep in mind when she left

24   the Capitol she saw the broken window.

25           She now had gotten separated from her friends that

1    had flown out here, the party group on that plane, so she

2    left the Capitol premises and walked across to the grass.  I

3    call that still on the Capitol grounds, but she's across all

4    the concrete in the grass sitting on a bench.  And she sat

5    there for a while waiting for her friends to come back out

6    from whatever they were doing, and they were leaving.

7          And the only, if you'll call it an act of

8    violence -- I would.  She saw one of the friends apparently

9    hit at a camera, a tripod or something.  She had nothing to

10   do with that.  She was not in a position to stop it.  She

11   didn't know it was going to happen.  It was spontaneous.

12   She saw it at most, did nothing to encourage that.  And she

13   would agree that it's illegal to do that.  She didn't do

14   that.

15         So her acts, as was pointed out by the probation

16   officer -- not the one we have here in court.  The probation

17   officer who wrote the PSR said that Ms. Ryan is among the

18   least culpable, the minimum, of all the defendants in this

19   case.  And literally her act for which she committed -- she

20   walked into the Capitol unimpeded, stood for two minutes and

21   eight seconds, I think the government says, and walked out.

22   No damage.  No destruction.  No violence.

23         And the fact that, you know -- again, she was on

24   social media after that in those ensuing days and said,

25   "Yes, I was part of this great thing."  Her acts since then

1    show her remorse.  Giving everything to the government

2    without having to have a warrant, giving them passwords that

3    they never would have gotten with a warrant.  Let's face it;

4    they wouldn't have gotten it legally.  She gave it to them.

5    And she's offered repeatedly, even to this prosecutor, to

6    come in and do a proffer, if they want it.  And they haven't

7    accepted it, but they could have.  It's been offered, and no

8    one will deny that.  And so I think we should look at what

9    she actually did.

10          Probation did consider the 3553 factors and said

11   that there was no reason -- Ms. Ryan doesn't need to be

12   rehabilitated.  There was no reason for incarceration in

13   this case.  This is a case that probation themselves

14   recommend probation.

15          We agree with that.  We think that would be an

16   adequate punishment.

17          THE COURT:  Okay.

18          MR. WOMACK:  Ms. Blake had offered that as well, I

19   mean, to be unopposed to that, but it was not in writing.  I

20   told her, "Look, I understand.  I'm a former AUSA.  You

21   can't say that."

22          She said, "Washington will tell me what to ask

23   for.  But yes, for what she did, I don't mind probation."

24          And that doesn't mean anything except I know

25   that's how she felt, and she had the case for all these

1    months until October 5th.

2              THE COURT:  Okay.  Anything else?

3              MR. WOMACK:  Nothing else, Your Honor.

4              THE COURT:  Okay.  Thank you, sir.

5              Ms. Rochlin, Mr. Womack mentioned the prior

6    negotiations with the Justice Department and the timing of

7    her plea.  Do you want to address that?

8              MR. ROCHLIN:  Your Honor, I'm not going to dispute

9    that negotiations may have started sometime before her plea

10   colloquy actually occurred and the plea was accepted by the

11   Court.  I'll give counsel that point.  I will note sometimes

12   the federal government does move slowly.

13             With respect to his negotiations with Ms. Blake,

14   who is now in private practice, I want to assure the Court

15   that before she left the Department of Justice we spoke

16   several times, and she and I did discuss what would be an

17   appropriate sentence in this case, as I had those

18   discussions with other supervisors, and I was not a witness

19   to conversations with counsel, but based on my

20   conversations, there is no disunity within the United States

21   about what this defendant should receive as a result of the

22   offense that she committed.

23             And I would point out -- and I would ask the Court

24   to indulge me just a little bit on the comment that this

25   defendant is among the least culpable.  It's true she was in

1   the Capitol for the two minutes, but that's not the shortest

2   amount of time of any defendant who has been charged for

3   spending time inside of the Capitol.

4        I would also point out that when I looked at other

5   defendants who have been charged --

6        THE COURT:  Counsel, I think we covered the

7   landscape in terms of the offense so we don't need to

8   replow.

9        MR. ROCHLIN:  Very well, Your Honor.  I won't beat

10   a dead horse then, but there are reasons to distinguish this

11   defendant, and I thank the Court for its consideration.

12        THE COURT:  Very well.

13        Ms. Ryan, anything you want to tell me before I

14   impose your sentence?  Why don't you both come to the

15   microphone.

16        THE DEFENDANT:  I just want to say that I'm very

17   sorry.  I mean, there's really not words to describe.  I was

18   foolish, and I made a mistake, and I learned from that

19   mistake, more like a thousand lessons, and I was just -- I

20   made a mistake, and I'm sorry, and you will never see me in

21   this light again.  I promise.  And it's just not anything

22   that remotely resembles who I am, and I'm sorry.

23        THE COURT:  All right.  I am not the kind of judge

24   that lectures defendants, and certainly not grown women like

25   yourself, but I do try to, in all cases, explain the reasons

1    why I have come to the sentence that I have, and I will do

2    so in this case and, in the course of doing that, try to

3    address as many of the arguments that Mr. Womack has made

4    and the points that the government has made in its memo.

5         And the starting point is what we call the nature

6    and seriousness of the offense.  It's what you did, right?

7    And there is a tendency in these January 6th cases, to lump

8    everybody together.  Those people.  Those rioters.  These

9    people.  On both sides of the aisle.

10        But, you know, there are over 700 of these

11   defendants now, and each one of them is different.  Each

12   defendant's role is different, and your particular

13   involvement has been discussed at length in the memos and

14   here in court today, and it is true that you played a lesser

15   role in the criminal conduct that took place than many

16   others did.  You were not an organizer.  You were not a

17   planner.  You did not break any windows or knock down any

18   doors or hurt anybody or steal anything, nor did you bring

19   any guns or knives.  And we see folks all over the map who

20   have done all of those things.

21        And you didn't make your way onto the Senate floor

22   like many others did.  And as your counsel has emphasized,

23   you were only in the building for about two minutes.

24        I think there's a dispute as to why you left.  I

25   think it is fair to assume that you may have left not

1    because you had second thoughts but because you didn't want

2    to experience the tear gas that you obviously noticed when

3    you hit the building.

4         But in any event, all those factors explain why

5    you are here on a single misdemeanor count rather than the

6    felony offenses that many others are facing, but that does

7    not mean that you don't have any culpability in what

8    happened that day.

9         Obviously you pled guilty to the count that you

10   did, but beyond that, I think the government is correct by

11   emphasizing that you knowingly took part in something that

12   was much more serious.  And I don't doubt that, you know,

13   you probably didn't appreciate the full seriousness of what

14   was going on that day, but it was much more dangerous than

15   just your stepping foot into the Capitol for two minutes.

16        You joined a large group of people who were intent

17   on, in your own words beforehand, storming the Capitol in

18   order to prevent the Senate and the Vice President from

19   performing their constitutional duty to certify the election

20   results.  And when you chose to leave your hotel room and

21   march down to the Capitol, I think it's clear that you knew

22   that this was no ordinary peaceful protest.  You knew that

23   because you were watching Fox News in real time in your

24   hotel room and commented that they're climbing the walls of

25   the Capitol.  You knew it at 12:28 when you got a Tweet

1    saying, quote, Trump supporters are now actively destroying

2    and trying to occupy the Capitol.  You claim you don't

3    remember reading that Tweet, but the metadata presented by

4    the government indicates that it was read.  You knew it when

5    you walked out of your hotel room and said we're going to

6    war, and we're going to be breaking windows.

7                THE DEFENDANT:  I did not say that.

8                THE COURT:  Now that may be hyperbolic --

9                THE DEFENDANT:  I didn't say that.

10                THE COURT:  -- but it's on the video.  And you

11   knew it when you got to the Capitol when the riot was still

12   going on.  You passed by a broken window.  You heard the

13   alarms going off, and you smelled tear gas; so I don't think

14   you could have missed the fact that this was no peaceful

15   protest and that there was violence going on around you.

16                Now, I know you didn't participate in it --

17                THE DEFENDANT:  Right.

18                THE COURT:  -- but you did celebrate it, and you

19   were a cheerleader.  You cheered it on.  You posted a Tweet

20   next to the broken window after you left and saying, you

21   know, to the media, "We're coming after you next."  And you

22   stood by and Tweeted while folks destroyed the media

23   equipment and the encampment after you left.  All right?

24                You didn't have to be there.  You could have gone

25   home.

1           THE DEFENDANT:  It was already done.

2           THE COURT:  You could have gone home.

3           THE DEFENDANT:  Yes.

4           THE COURT:  Once that tear gas hit you and you

5    realized what was going on and this was not the place to be,

6    you could have gone home; but you didn't, okay?

7           And in any case, even if your own conduct was

8    peaceful, as a number of my colleagues have noted, you still

9    bear at least some degree of responsibility for the tragedy

10   of that day.

11          I believe you.  You didn't see any police.  You

12   walked right by a police officer.  He didn't try to stop

13   you.  He didn't say, "Don't go in."  I get that.

14          But one reason for that is because they were

15   outnumbered.  They were overwhelmed, all right?  And it was

16   the presence of the group.  There is strength in numbers.

17   It was the presence of the mob that caused law enforcement

18   to be overwhelmed and not to be in a position to stop people

19   from going in.  And that makes every person who decided to

20   go in that day -- even if it was somewhat after the fact

21   like you.  You weren't the first person in.  I get that.

22   But your very presence, your very numbers, mean that you

23   have at least some responsibility for what happened that

24   day.

25          Let me make clear, we've talked about the First

1    Amendment.  I will reiterate what the government has said.

2    No one is being prosecuted for coming to Washington, D.C.,

3    that day.  No one is being prosecuted for the belief that

4    the election was stolen.  If you had the good sense not to

5    leave your hotel room or even to go down there and to stop

6    one foot before you went in, you wouldn't be here today,

7    okay?  The only reason that you are here is because you

8    decided to join in and to go into the building.

9         And not to belabor the point, but I think it's an

10   important one.  We get protesters all the time in

11   Washington, D.C.  I see them from my window virtually every

12   week.  Sometimes I don't even know what they're protesting.

13   And that's great.  That's part of our democracy.  We

14   encourage it.

15        But when folks get unruly, when they break stuff,

16   when they hurt people, the police make arrests, and

17   sometimes those people get charged.

18        A few years ago the U.S. Attorney's Office here in

19   D.C. charged five protesters with disrupting a Supreme Court

20   argument.  They didn't like the Supreme Court's decision in

21   *Citizens United*.  Do you know what *Citizens United* is?

22        THE DEFENDANT:  (No verbal response)

23        THE COURT:  It's a Supreme Court decision that

24   permitted or said that corporations and other organizations

25   have a First Amendment right to contribute unlimited sums of

1    money in support of political candidates, okay?  And a lot

2    of people didn't like that.

3              THE DEFENDANT:  Okay.

4              THE COURT:  And most of those folks were on the

5    left.  And five folks came, and they stood up and disrupted

6    a Supreme Court argument.  Like you, they didn't hurt

7    anybody.  They didn't break anything.  But they were charged

8    with federal misdemeanors, just like you, all right?

9              So you're not being singled out for your political

10   views or anything like that.  And I told them the exact same

11   thing.  It's not about the political views that you

12   expressed, but it's how and where you decided to express

13   them.  Okay?

14             The next thing I have to consider is you, all

15   right, your particular characteristics.  I've read all of

16   the materials.  You were dealt some bad cards as a kid, and

17   I don't feel the need -- and in your adult life as well, and

18   I feel no need to go into that on the record.  But

19   especially given where you started from, you've obviously

20   had to work very hard, and you've had to hustle for the

21   professional success that you have achieved, both in your

22   real estate business and in your various social media

23   ventures.

24             THE DEFENDANT:  Yes.

25             THE COURT:  And you should be proud of that, and

1     you can take credit for that.

2              On the other side of the coin, your statements and

3     your media appearances after January 6th, I think,

4     demonstrate a certain lack of accountability for your

5     actions, okay?  You've played down your role in the events.

6     You've been very up front that you feel no sense of shame or

7     guilt.  You've blamed the FBI.  You've called this a witch

8     hunt.  You've suggested that Antifa was somehow involved

9     despite no evidence whatsoever of that, and perhaps most

10    famously, in words that I'm sure that you regret, you

11    predicted that you wouldn't go to jail because you have

12    blonde hair and white skin.

13             THE DEFENDANT:  I was taking up for myself.

14    Someone -- I was being attacked, and I was answering them,

15    and they were saying you're a blonde insurrectionist.  So I

16    was taking up for myself.  I didn't just Tweet that as a --

17    but of course that was -- I shouldn't have -- I just

18    shouldn't Tweet.

19             I mean, I was really taking up for myself, and I

20    didn't do a great job at that.

21             THE COURT:  Okay.  And, again, you're free to say

22    all of those things.

23             THE DEFENDANT:  Well --

24             THE COURT:  But by making those appearances and

25    going on social media, you know, the folks who respond have

1    a First Amendment right to respond even if they do so in

2    completely inappropriate --

3                THE DEFENDANT:  They were doing it already.

4                THE COURT:  -- ways, okay?  But you put yourself

5    out there, all right, and they responded.  And if they

6    responded by vandalizing your real estate signs or doxing

7    you or, you know, threatening you, then that is not

8    protected by the First Amendment.  But certainly their

9    Tweets are, and, you know, you get yourself into that briar

10   patch, and you've got to live with it, right?

11               THE DEFENDANT:  Yes.

12               THE COURT:  And as Mr. Womack acknowledged, you

13   know, while you have a right to go on ABC News and say all

14   those things and Tweet, you know, I can't disregard that.  I

15   can assess whether you've shown genuine remorse, whether

16   you've truly accepted responsibility beyond just signing

17   that plea document --

18               THE DEFENDANT:  Right.

19               THE COURT:  -- and whether you have shown, you

20   know, respect for the law and respect for this Court; and

21   it's not about me personally, but about respect for the

22   process.  And your actions since January 6th, you know,

23   makes me doubt some of those things.

24               But that brings me to the need for general

25   deterrence, right?  And you noted somewhere I read that for

1    better or for worse you've become one of the faces of the

2    January 6th incident, right?  Now, I think you may have --

3    you know, that may be part of your responsibility, by being

4    so public in your statements about it, but for whatever the

5    reason your case has generated a fair amount of public

6    interest, and as a result, people will be interested to know

7    what sentence you get, and that sentence will tell them

8    something about how the courts and about how our country

9    responded to what happened on January 6th.  And I think that

10   the sentence should tell them that we take it seriously;

11   that it was an assault on our democracy; that it cost the

12   lives of five people; that it had lasting and potentially

13   dangerous effects on our government institutions; and that

14   it should never happen again.

15           That does not mean that everyone who participated

16   should be charged with a felony.  That does not mean that,

17   you know, misdemeanant defendants should not get probation

18   in appropriate cases, and I suspect that many of them will,

19   and many of them have thus far.

20           The Justice Department has a very difficult role

21   of balancing all of the competing factors, including the

22   need to just physically process the 700 and growing number

23   of defendants that have been charged thus far.  And they

24   have to do that while at the same time reaching

25   individualized charging decisions and sentencing

1    recommendations.

2         Folks are going to second-guess those decisions

3    from both sides.  That's only natural.  But in this case, at

4    least, I believe that the Department has exercised that

5    responsibility appropriately and has struck the right

6    balance in the sentencing recommendation that it has

7    provided me.

8         So with that, pursuant to the Sentencing Reform

9    Act of 1984 and in consideration of the provisions of 18 USC

10   Section 3553 as well as the advisory sentencing guidelines

11   or at least the factors set forth, it is the judgment of the

12   Court, that you, Jennifer Leigh Ryan, are hereby committed

13   to the custody of the Bureau of Prisons for a term of 60

14   days imprisonment on Count 4.  In addition, you are ordered

15   to pay a special assessment of $10 in accordance with 18 USC

16   3013.  The Court will also impose a fine of $1,000 to be

17   payable within 90 days.  You are also ordered to make

18   restitution in the amount of $500 to the Architect of the

19   Capitol.  The Court waives any interest or penalties that

20   may accrue on that balance.

21        Fine and restitution payments shall be made to the

22   Clerk of the Court for the United States District Court for

23   the District of Columbia for disbursements to the following

24   victim:  The Architect of the Capitol.  And the address will

25   be in the judgment and committal order.

1           Financial obligations are immediately payable to

2    the Clerk of the Court of the United States District Court.

3    Within 30 days of any change of address you shall notify the

4    Clerk of the Court of the change until such time as the

5    financial obligation is paid in full.

6           You have a right to appeal the sentence imposed by

7    the Court if the period of imprisonment is longer than the

8    statutory maximum.  If you choose to appeal, you must file

9    any appeal within 14 days after the Court enters judgment.

10          You also have the right to challenge the

11   conviction entered or the sentence imposed if new and

12   currently unavailable information becomes available to you

13   or on a claim that you received ineffective assistance of

14   counsel in entering a plea of guilty to the offense of

15   conviction or in connection with this sentencing.  If you

16   are unable to afford the cost of an appeal, you may request

17   permission from the Court to file an appeal without cost to

18   you.

19          The Court will direct -- no issue with self-

20   reporting, Ms. Rochlin?

21          MR. ROCHLIN:  No, Your Honor.

22          THE COURT:  Okay.  The Court will order the

23   defendant to report on a date after January 3rd.

24          Any other objections to the sentence?

25          MR. ROCHLIN:  Not from the United States, Your

```
 1   Honor.

 2              THE COURT:  Mr. Womack?

 3              MR. WOMACK:  No, Your Honor.

 4              THE COURT:  Okay.  Placement recommendation?

 5   Recommend someplace near the Northern District of Texas?

 6              MR. WOMACK:  Yes, Your Honor.  The only facility I

 7   believe is in Bryan, Texas, in the southern district.  It's

 8   not too far from Dallas.

 9              THE COURT:  Ms. Ryan, we will recommend a

10   placement near your home in Dallas.  The Court's

11   recommendation is not binding.  The Bureau of Prisons will

12   determine where you will be placed, and you should await

13   further instructions from them, all right?

14              There is no probation or supervised release in

15   this case so I will not see you again.

16              THE DEFENDANT:  Okay.

17              THE COURT:  Unless you decide to come back to D.C.

18   for some reason.

19              THE DEFENDANT:  Never.

20              THE COURT:  I know that in your letter you said

21   that you plan to stay away from politics and stick to, as

22   you say, make-up and macaroni and cheese.

23              THE DEFENDANT:  Yes.  I think that's a good idea.

24              THE COURT:  That might be a wise idea, although

25   I -- you know, I encourage everyone to remain, you know,
```

53

1    active in political life.  I would simply suggest -- and you

2    don't have to take my suggestion -- that if you do so

3    perhaps be a little more discriminating and far-ranging in

4    your selection of news and information sources, okay?

5                  THE DEFENDANT:  Okay.

6                  THE COURT:  All right.  Good luck to you, ma'am.

7                  THE DEFENDANT:  Thank you.

8                  THE COURTROOM DEPUTY:  Your Honor, the remaining

9    charges --

10                 THE COURT:  The government should dismiss the

11   other charges in the information.

12                 MR. ROCHLIN:  Yes, Your Honor.  Forgive me for

13   being a little slow on the uptake, but the United States so

14   moves.

15                 THE COURT:  All right.  So ordered.

16                 Anything else, Counsel?

17                 MR. WOMACK:  No, Your Honor.

18                 THE COURT:  Okay.  Good luck, Ms. Ryan.

19                 THE DEFENDANT:  Thank you.

20                       (Whereupon the hearing was

21                        concluded at 11:22 a.m.)

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 10th day of November, 2021.

9

10                                   /s/Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25