**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**UNITED STATES OF AMERICA**,

v.

**JENNIFER LEIGH RYAN**,

Defendant.

</td><td>

Case No. 21-cr-50-1 (CRC)

</td></tr>
</table>

**MEMORANDUM OPINION**

Dallas-area real estate agent Jennifer Leigh ("Jenna") Ryan participated in the U.S. Capitol riot on January 6, 2021. Charged with multiple misdemeanor offenses, she pled guilty to willfully and knowingly parading, demonstrating, or picketing in a Capitol building, see 40 U.S.C. § 5104(e)(2)(G), and was sentenced by this Court to sixty days in prison. She completed that sentence in 2022.

Several months after receiving a pardon from President Trump in early 2025, Ryan returned to this Court with a petition for a writ of error *coram nobis*, an "extraordinary" and "ancient common-law remedy" allowing a court, in its discretion, to vacate a criminal defendant's conviction due to some fundamental error in the proceedings. United States v. Denedo, 556 U.S. 904, 910–11 (2009). In her petition, Ryan presents a laundry list of grievances that she claims infected her prosecution, guilty plea, and sentencing. In light of these supposed errors, she asks the Court to wipe her record clean by vacating her conviction.

The Court will deny Ryan's request for this "extraordinary" collateral relief. Id. at 911. Ryan's knowing and willing guilty plea effectively waived most of her *coram nobis* arguments. What's more, the "errors" she identifies are illusory and, even if they could be substantiated, nowhere near fundamental enough to taint her conviction or sentencing.

## I.    Background

### A.  The Offending Conduct

On January 6, 2021, a joint session of Congress convened at the Capitol to certify the results of the 2020 presidential election.  Stmt. of Offense ¶ 3.  As proceedings unfolded, a large crowd gathered outside the Capitol and breached the barricades around the building's perimeter. Numerous members of the mob forced their way inside the Capitol building by breaking windows and assaulting police officers.  Hundreds of others followed.  Id. ¶¶ 4–5.  The crowd was not lawfully authorized to enter or remain in the building, and none of the rioters underwent security screenings or weapons checks by authorized security officials.  Id. ¶ 5.  The breach halted election certification proceedings and led to the evacuation of members of Congress.  Id. ¶¶ 6–7.  Law enforcement did not secure the building until 8 p.m. that evening.  Id. ¶ 7.

Ms. Ryan traveled from Texas to Washington, D.C. on January 5, 2021 with several companions.  Id. ¶ 8.  In the afternoon on January 6, Ryan posted a video on Facebook stating that she was going to "go down and storm the Capitol."  Id. ¶ 9.  She posted a second video shortly thereafter, which showed her walking toward the Capitol building.  Id. ¶ 9.  Surveillance footage depicted Ryan and her acquaintances entering the Capitol through the Rotunda.  Id. While inside the building, Ryan was captured on video in the middle of a crowd, chanting "Fight for Trump!" while fire alarms blared.  Id. ¶ 11.  Later in the evening, Ryan posted to her Twitter account, "Today was a great example of what America is all about."  Id. ¶ 13.  The next day, Ryan Tweeted once more:  "We just stormed the Capit[o]l. It was one of the best days of my life."  Id. ¶ 14.  According to the Statement of Offense, which Ryan accepted when she pled guilty to her criminal conduct, she knew upon entering the Capitol that she did not have permission to do so.  Id. ¶ 15.

B. Prosecution, Guilty Plea, and Sentencing

The government charged Ryan with four misdemeanor offenses: (1) knowingly entering and remaining in the U.S. Capitol without lawful authority to do so, see 18 U.S.C. § 1752(a)(1); (2) knowingly and with intent to impede and disrupt government business engaging in disorderly and disruptive conduct in and within proximity to the U.S. Capitol, see id. § 1752(a)(2); (3) willfully and knowingly engaging in disorderly and disruptive conduct in Capitol buildings with intent to impede and disrupt a session of Congress, see 40 U.S.C. § 5104(e)(2)(D); and (4) willfully and knowingly parading, demonstrating, or picketing in a Capitol building, see id. § 5104(e)(2)(G). See ECF Nos. 18, 34.

In mid-2021, the government extended Ryan an offer to plead guilty to the fourth count (i.e., parading, demonstrating, or picketing in a Capitol building). See Plea Agreement at 1. She accepted the offer. The guilty plea had a number of consequences. First, Ryan agreed that the Statement of Offense "fairly and accurately describe[d]" her actions and involvement in the events of January 6. Id. at 2. In signing the Statement of Offense, she further acknowledged that she was pleading guilty "voluntarily and of [her] own free will," that the statement's contents were "true and accurate," and that she was not under any "threat[]" or "influence" that would have "impede[d] [her] ability to understand this Statement of the Offense fully." Stmt. of Offense at 5. Second, Ryan acknowledged that the entry of her plea "authorize[d] the Court to impose any sentence, up to and including the statutory maximum sentence" and that she could not withdraw the plea based on the length of the sentence imposed by the Court. Plea Agreement at 3. Third, she agreed to waive various rights under the Constitution and certain statutes and rules, including the right to further discovery, the right to a jury trial, the right to plead not guilty, and the right against self-incrimination. Id. at 4–5. Fourth, Ryan waived her right to directly

3

appeal her conviction and sentence, except on the basis of ineffective assistance of counsel.  Id. at 5.  *Finally*, she waived "any right to challenge the conviction entered or sentence imposed" by collateral attack, "including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion [was] based on newly discovered evidence" or a claim of ineffective assistance of counsel.  Id.

In August 2021, the Court held a plea hearing and found that Ryan was "fully competent and capable of entering an informed plea" after brief questioning.  Plea Hr'g Tr. at 5:18–19.  In open court, with her attorney by her side, Ryan affirmed that she had reviewed and discussed the plea paperwork with counsel and was satisfied with her representation in the matter.  Id. at 5:3–11.  Ryan also verified that she understood that she was giving up her trial and appeal rights by pleading guilty.  Id. at 5:20–6:16.  The factual basis for the plea as described by the Statement of Offense was read into the record, and Ryan affirmed that she understood the elements of the offense, agreed with the recitation of the facts, and had signed the Statement of Offense after reviewing the relevant paperwork with her lawyer.  Id. at 5:3–8, 7:8–10:16.  The key terms of the plea agreement were also read into the record, including waiver of her appeal and collateral-attack rights.  Id. at 10:18–11:3.  Ryan affirmed that she understood "the sentence that the Court ultimately impose[d] [would] not be a basis for withdrawing [her] guilty plea."  Id. at 12:4–7. Lastly, Ryan avowed that she was not being forced to plead guilty, that she was pleading guilty "voluntarily and of [her] own free will," and that she had no further questions.  Id. at 12:8–20.

The misdemeanor offense to which Ryan pled guilty carried a maximum term of imprisonment of up to six months and a fine of up to $5,000.  Id. at 11:4–7.  After reviewing the Probation Office's presentence investigation report ("PSR"), the government advocated for a sixty-day term of imprisonment; Ryan sought probation, as recommended by the Probation

Office.  Ryan expressed remorse in a letter to the Court, explaining that she regretted her decisions.  Def.'s Sentencing Mem., Ex. 1.  Neither party objected to the facts described in the PSR.  Sent'g Hr'g Tr. at 4:17–5:2.

Ryan proceeded to sentencing a few months later in November 2021.  After hearing from counsel on both sides, as well as Ryan herself, the Court sentenced her to sixty days imprisonment, a $1,000 fine, $500 in restitution, and $10 as a special assessment.  Id. at 50:8–20.  In justifying the sentence, the Court distinguished Ryan's particular conduct.  Sent'g Hr'g Tr. at 41.  As both sides recognized at the hearing, Ryan was in her hotel room when she saw people scaling the walls of the Capitol on a television broadcast.  Id. at 42.  Rather than avoid the melee, she chose to leave the hotel and join the crowd.  Id. at 27–28, 42–43 (acknowledged by Ryan's attorney and the Court).  Upon entering the Capitol building, she encountered tear gas and heard alarms blaring.  Id. at 30, 43.  As she left, Ryan passed a broken window and photographed it.  Id. at 29, 43.  She could have gone home but instead remained in the area, posting a picture of the broken window to social media with the caption, "And if the news doesn't stop lying about us we're going to come after their studios next . . ."  See Gov't Sent'g Mem. at 3; Sent'g Hr'g Tr. at 43:18–21.[1]  And she stood by and continued to post as at least one of one of her companions destroyed media equipment nearby.  See Sent'g Hr'g Tr. at 43:21–23.  In the days following, Ryan appeared on television and posted statements on social media, id. at 31:16–32:7, which the Court understood to downplay her involvement and deflect full responsibility for her part in the riot, id. at 47:2–48:23.  On Twitter, Ryan predicted that she would not go to jail because she had "blonde hair" and "white skin."  Id. at 47:10–12; see also Gov't Sent'g Mem. at 13.

---

[1] The PSR, which even now Ryan accepts as "undisputed," see Pet. at 17, substantiates this ominous post.

Based on her active participation in the breach and her failure—in the Court's view—to take full responsibility for her uncontested actions, the Court accepted the government's sixty-day sentencing recommendation.  Sent'g Hr'g Tr. at 50.  It reiterated multiple times that Ryan was not being prosecuted for her speech or viewpoint, but only for her criminal conduct on January 6.  Id. at 45–46.

C.  Post-Sentencing Events

Ryan completed her sentence in 2022 with no apparent fanfare.  In 2024, President Trump was reelected.  Almost immediately upon his return to office, he issued a blanket pardon to all individuals convicted of offenses relating to the events of January 6, 2021, including Ryan.  See Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, 90 Fed. Reg. 8331 (Jan. 20, 2025).  On the same day, the President also issued an executive order entitled "Ending the Weaponization of the Federal Government," which recharacterized the prosecution of individuals involved in the events of January 6 as politically motivated and affirmed the new administration's lenient stance towards January 6 protestors, regardless of offense.  See Ending the Weaponization of the Federal Government, 90 Fed. Reg. 8235 (Jan. 20, 2025).

D.  Procedural History

Eight months after being pardoned, Ryan filed a petition for a writ of error *coram nobis* and a motion for the recusal of the undersigned judge, alleging what she characterized as errors and indicia of bias in her prosecution and sentencing.  She is no longer represented by counsel in

6

this matter.  The government opposed her petition and recusal motion, and Ryan filed a reply in support of her petition.[2]  The petition and motion for recusal are now ripe for adjudication.

## II.  Legal Standard

The writ of error *coram nobis* is an "ancient common-law remedy" whose "modern iteration" allows a criminal defendant to challenge convictions that rest on "fundamental" factual or legal errors.  Denedo, 556 U.S. at 910–11; see also United States v. Morgan, 346 U.S. 502, 511–12 (1954).  "In federal courts the authority to grant a writ of *coram nobis* is conferred by the All Writs Act[.]"  Denedo, 556 U.S. at 911.  "Because *coram nobis* is but an extraordinary tool to correct a legal or factual error, an application for the writ is properly viewed as a belated extension of the original proceeding during which the error allegedly transpired."  Id. at 912–913.  At the same time, *coram nobis* is a means of collateral attack, rather than a direct attack, on a criminal judgment.  Wall v. Kholi, 562 U.S. 545, 559–60 (2011).  Unlike the writ of habeas corpus, another form of collateral attack, *coram nobis* is available even if a defendant is no longer in custody.  See, e.g., United States v. Newman, 805 F.3d 1143, 1145 (D.C. Cir. 2015).

Given the importance of finality in the criminal justice system, "[t]he Supreme Court has always envisioned coram nobis as strong medicine, not profligately to be dispensed."  United States v. George, 676 F.3d 249, 254 (1st Cir. 2012) (citing Denedo, 556 U.S. at 911; Carlisle v. United States, 517 U.S. 416, 429 (1996)).  Successful writs of error *coram nobis* are exceedingly rare, the "criminal-law equivalent" of a "Hail Mary pass."  Id. at 251; see also United States v.

---

[2] Ryan also requested leave to file notices of "supplemental evidence" and "supplemental authority" purporting to bear on the continued collateral consequences of her conviction.  See ECF Nos. 122, 128.  The Court will deny those requests, as Ryan's proposed filings were submitted outside of the briefing timeline and parameters established under the Local Rules and the Court's minute orders.  Even if the contents of the notices were to be considered, they would have no bearing on the Court's resolution of Ryan's petition.

Cerroni, No. 24-3194, 2026 WL 124324, at *1 (D.C. Cir. Jan. 16, 2026).  "Whether to grant relief under a writ of error *coram nobis* is a decision committed to the discretion of the Court; federal judges may exercise their discretion by granting relief to correct serious defects underlying the conviction or sentence if those defects were not correctable on appeal or where exceptional circumstances otherwise justify such relief."  United States v. Hansen, 906 F. Supp. 688, 692 (D.D.C. 1995) (citing United States v. McCord, 509 F.2d 334, 341 (D.C. Cir. 1974)).  Said another way, *coram nobis* is not merely "a substitute for direct appeal," Cerroni, 2026 WL 124324, at *2 (quoting In re Egan, 339 Fed. App'x 314, 315 (4th Cir. 2009)), nor is it "a free pass for attacking criminal judgments long after they have become final," United States v. Faison, 956 F. Supp. 2d 267, 270 (D.D.C. 2013) (citation omitted).

In the D.C. Circuit, courts assess petitions for a writ of error *coram nobis* using a four-part test.  Petitioners must show that: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character."  Cerroni, 2026 WL 124324, at *1 (quoting United States v. Lee, 84 F. Supp. 3d 7, 9 (D.D.C. 2015)); see also United States v. Williams, 630 F. Supp. 2d 28, 32 (D.D.C. 2009); Hansen, 906 F. Supp. at 692–93.  A fundamental error in the *coram nobis* context is one that "render[s] the proceeding itself irregular and invalid."  Lee, 84 F. Supp. 3d at 10 (quoting United States v. Addonizio, 442 U.S. 178, 186 (1979)).

A final aside.  While Ryan was previously represented by a defense attorney in this case, she now proceeds *pro se*.  "A document filed *pro se* is to be liberally construed" and "held to less stringent standards than formal [filings] drafted by lawyers."  Abdelfattah v. DHS, 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).  The Court will thus

construe Ryan's filings liberally—while nevertheless meticulously applying the four-part *coram nobis* test and without lessening her "burden" to "overcom[e]" a baseline "presumption that the challenged judicial proceedings were correct." Williams, 630 F. Supp. 3d at 32; see also Morgan, 346 U.S. at 512.[3]

### III.  Analysis

#### A.  Has Ryan Waived Collateral Review?

A threshold question is whether Ryan can pursue her petition for a writ of error *coram nobis* after having pled guilty to the offense of parading, demonstrating, or picketing in a Capitol building.  A guilty plea does not categorically preclude the later filing of a *coram nobis* petition, as it is possible that the plea may rest on some fundamental error only redressable by the *coram nobis* writ (most commonly, ineffective assistance of counsel).  However, "when a defendant seeks to vacate a guilty-plea conviction by way of coram nobis, red flags accompany that request." George, 676 F.3d at 258.  That is because "[u]ndeniable advantages, such as limiting exposure to punishment, flow[]" from the "decision" to plead guilty, and the "flip side" of that choice is that an "unconditional guilty plea waive[s] virtually all objections and defenses for purposes of direct appeal." Id. at 256.  The *coram nobis* remedy, meanwhile, is reserved for the

---

[3] As part of her petition, Ryan has included over 280 pages of "exhibits," most of which are not exhibits at all but rather catalogs of purported error, timelines of proceedings, or disagreements with factual characterizations. See, e.g. Pet. for Writ of Error Coram Nobis, Ex. K at 3 (listing a "table of discrepancies" where Ryan takes issue with "DOJ's inflammatory narrative" as compared to her "actual conduct").  "[A] *pro se* litigant cannot simply dump a stack of exhibits on the court and expect the court to sift through them to determine if some nugget is buried somewhere in that mountain of papers, waiting to be unearthed and refined into a cognizable claim." Brewer v. Burns, No. 23-CV-9605 (LTS), 2023 WL 8355914 (S.D.N.Y. Dec. 1, 2023) (citations omitted). While the Court has done its best to construe Ryan's filings liberally, it considers the exhibits only insofar as Ryan has actually marshalled them in support of arguments she advances in her briefs.

most "serious defects" that would not even have been "correctible on direct appeal." McCord, 509 F.2d at 341.

That caution in mind, the Court returns to Ryan's guilty plea and confirms that it was knowing and willing. In the plea agreement itself, Ryan attested that she had "read every page" of the agreement, "discussed it with [her] attorney" (whom she accuses of no ineffective assistance), "fully underst[oo]d" it, and was pleading guilty "voluntarily and of [her] own free will." Plea Agreement at 9. At her plea hearing, Ryan admitted under oath that she entered the Capitol building on January 6 without permission and "paraded, demonstrated, or picketed" and acknowledged that she had no opposition to the agreed factual basis for her plea. Plea Hr'g Tr. at 10:2–10; 9:19–22. She also confirmed that she understood that the sentence ultimately imposed would not be grounds for withdrawing the guilty plea; that she was not being "forc[ed]" to plead guilty; and that she was "pleading guilty voluntarily and of [her] own free will." Id. at 12:8–16.

Ryan now suggests that her plea was "not the product of free will or informed consent" after all because it was "extracted through prosecutorial threats, public vilification, fabricated narratives, and suppression of exculpatory evidence." Pet. for Writ of Error Coram Nobis ("Pet.") at 28. This inventive about-face is belied by both the record and the law. To begin, the Court conducted Ryan's plea colloquy in accordance with Federal Rule of Criminal Procedure 11, and that adherence in itself "support[s] the conclusion that [Ryan] knowingly and voluntarily pled guilty." United States v. Khan, 550 Fed. App'x 2, 5 (D.C. Cir. 2013). Moreover, Ryan's counsel represented to the Court that from her "very first conversation" with the original prosecutor on the case in February 2021, Ryan was *affirmatively* "offering to plead guilty" and cooperate with the government. Sent'g Hr'g Tr. at 34:9–35:1. The Court has no reason to

10

second-guess counsel's recollection of events in open court, especially since Ryan has taken no issue with the quality of her former attorney's representation.  Despite insisting that her stated remorse was "[c]ompelled," see, e.g., Pet. at 26, Ryan likewise avers that "[i]mmediately after [her] arrest," she "repeatedly offered to proffer to federal agents and prosecutors," and confirms that she "expressed remorse in writing and at sentencing."  ECF No. 124-2, Ryan Decl. ¶¶ 3–4; see also Pet. at 32 ("Petitioner repeatedly offered to proffer following her arrest[.]").  Ryan may now—for whatever reason—regret having pled guilty, but any buyer's remorse she may harbor does not mean she was the victim of "coercion" in the first instance.

There is yet more.  Ryan has offered absolutely no legitimate evidence to support her claim that prosecutors improperly charged her or coerced her into a guilty plea on one charge by bringing multiple charges against her.  "[I]t is a well-accepted proposition that when a defendant's conduct violates more than one criminal statute, the prosecutor has wide discretion to charge . . . the defendant with violating any of the applicable statutes."  United States v. Trie, 21 F. Supp. 2d 7, 19 (D.D.C. 1998); cf. United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (emphasizing the government's broad "discretion over charging determinations"); Khan, 550 Fed. App'x at 5 (complaint of coercion based on possibility of additional charges "has been soundly rejected as a legitimate basis to find a plea involuntary").[4] Ryan also claims she faced "[e]xtraordinary [e]xternal [p]ressure" to plead guilty from those who did not take kindly to the events of January 6.  Pet. at 29.  But that sentiment does not vitiate her otherwise knowing and willing consent to the plea.  And finally, as the Court will explain in a

---

[4] Equally baseless is Ryan's suggestion that the government violated her due process rights by "overcharging" her—with four misdemeanor offenses, no less.  Pet. at 26.

11

moment, Ryan has not shown that the government withheld any material evidence from her during the course of the prosecution, as she asserts.

To sum up:  Ryan's repeated professions of guilt—including by "[s]olemn declaration[]" in open court," which "carr[ies] a strong presumption of verity," Blackledge v. Allison, 431 U.S. 63, 74 (1977)—demonstrate that her guilty plea was knowing and voluntary.  Her revisionist accusations of government coercion do nothing to undermine that conclusion.

What's the upshot?  As a general matter, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked."  United States v. Miranda, 780 F.3d 1185, 1188 (D.C. Cir. 2015) (citation omitted). There are, of course, exceptions.  A plea agreement may itself carve out grounds for legal challenge either on direct appeal or through collateral attack.  There are also certain arguments that are "immune from waiver."  Id.  For instance, a criminal defendant cannot waive her right to contest the district court's subject-matter jurisdiction over her case, and she may also levy "certain [non-waivable] constitutional challenges asserting a right not to be haled into court at all."  Id. (cleaned up).  The latter of these two immune-from-waiver arguments is known as the Menna-Blackledge exception.  See Class v. United States, 583 U.S. 174, 178–82 (2018) (describing the doctrinal evolution of the exception).

Most of Ryan's *coram nobis* arguments appear to be foreclosed by her guilty plea, whether because they rely on constitutional guarantees that she has validly foregone; generically challenge "the constitutionality of case-related government conduct that [took] place before the plea [was] entered" without showing that such conduct would have changed the plea outcome; or rest on claims "that would contradict the admissions necessarily made upon entry of a voluntary plea of guilty."  Id. at 182–83 (cleaned up).

Reading the petition generously, the Court sees only two possible avenues for legal challenge that are unobstructed by Ryan's guilty plea.  First, the terms of her plea agreement permit a collateral attack on the "conviction entered or sentence imposed" insofar as the attack is "based on newly discovered evidence" or on a claim of ineffective assistance of counsel.  Plea Agreement at 5.  The *coram nobis* petition does not make the latter claim, but does assert the former.  Second, Ryan's petition could perhaps be understood to argue that she should not have been haled into court in the first place under the Menna-Blackledge doctrine because she was the target of selective prosecution.  Assuming for the sake of argument that Ryan's assertion falls within the coverage of the exception, the Court will consider it.

Additionally, given the historical significance of the events of January 6 and ongoing efforts to rewrite them, the Court will take the opportunity to set the record straight as to why none of Ryan's other attempts at demonstrating fundamental error would succeed even if she had not waived the lion's share of them by pleading guilty.

With this roadmap in place, the Court turns to the merits of Ryan's *coram nobis* petition.

B.  Can Ryan's Petition Succeed on the Merits?

Recall that, in this circuit, a petitioner for a writ of error *coram nobis* must establish that "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character." Lee, 84 F. Supp. 3d at 9.

Ryan's petition rests on sand for multiple reasons.  It is far from clear why she has waited years to bring this challenge to her conviction, leaving the Court to wonder whether "valid reasons exist for not attacking the conviction earlier." Id.  Vague justifications, see Reply Br. at

26, will not do.  It is even less clear whether Ryan has experienced the kinds of adverse consequences that suffice to support *coram nobis* relief.  After all, she received a pardon from the President that has presumably released her "from the consequences of [her] offence," including any "disabilities imposed" by it, and restored any "civil rights" of which she might have been stripped.  United States v. Webster, No. 21-cr-208 (APM), 2026 WL 237597, at *1 (D.D.C. Jan. 28, 2026) (citation omitted) (denying a petition for a writ of *coram nobis* following the plaintiff's pardon because he "does not face the same collateral consequences following his pardon").[5]  And any other reputational and business harms that Ryan has identified seem unlikely to be meaningfully redressed by a favorable decision from this Court.  There is no doubt that Ryan paraded in the Capitol without permission on January 6, and the negative social and economic consequences that flowed from participating in the riot will not be scrubbed from public memory, even if her conviction is vacated.  Cf. United States v. Verrusio, No. 09-cr-64 (BAH), 2017 WL 2634638, at *4–5 (D.D.C. June 19, 2017) (holding that a defendant could not satisfy the adverse consequences prong of the *coram nobis* test where the vacatur of his conviction would not redress the "adverse consequences of which the petitioner complain[ed]"); Rossini v. United States, No. 08-cr-692 (JMF), 2014 WL 5280531, at *4 (D.D.C. Oct. 14, 2014) (denying a petition for a writ of *coram nobis* because "even if the petitioner's writ of *coram nobis* was granted and his conviction was vacated, the injury he claims he suffered—that he can no longer obtain employment in the field of counterterrorism—would not necessarily be redressed").

---

[5] In an affirmative Federal Tort Claims Act challenge to the government's conduct in this criminal case, Ryan herself stresses that the presidential pardon "removed any ongoing penal consequences of the conviction."  See Compl. ¶ 9, Ryan v. United States, No. 26-cv-1069 (CRC).

Ryan's petition fails definitively, in any case, on the final prong of the four-part *coram nobis* test:  She has not identified any "fundamental error" in her conviction or sentencing that would warrant vacatur under the exacting *coram nobis* standard.  Fundamental error is one of "unjust character which probably would have altered the outcome of the challenged proceeding if it had been known" at the relevant time.  Faison, 956 F. Supp. 2d at 271.  The decision to enter into a plea bargain cuts "against finding an error of the most fundamental character."  George, 676 F.3d at 257.  And "[c]ourts generally deny *coram nobis* petitions when none of the material facts or applicable laws have changed since defendant's conviction."  United States v. Pole, 09-cr-354 (EGS), 2021 WL 5796518, at *9 (D.D.C. Dec. 7, 2021) (cleaned up).

In the remainder of this opinion, the Court runs through Ryan's laundry list of arguments for *coram nobis* relief, beginning with the two arguments that are likely not waived by the guilty plea and then, for good measure, those arguments that are almost certainly waived.  The bottom line is that none of the material facts regarding Ryan's conduct on and after January 6 have changed, nor do any intervening factual developments or authorities reveal *any* error, much less fundamental error, in her conviction or sentence.

### 1.  *"Newly Discovered" Evidence*

Ryan contends that "new evidence . . . undermine[s] both the factual and legal basis of her conviction."  Pet. at 10.  The principal piece of evidence she offers is CCTV footage—purportedly obtained through discovery in a different January 6 prosecution—which shows two Capitol Police officers allowing rioters to enter the building through the eastern door of the Rotunda.  The video does not show Ryan, though she compares the video to another photographic image and suggests that one of the same officers was standing nearby the same door when she entered.  See Pet., Ex. A at 1–2.  She also includes a litany of other miscellaneous

pieces of "evidence," including the January 6 presidential pardon and "weaponization" executive order, as well as other materials that purport to recast the Capitol riot. See Pet. at 11–12.

As explained above, Ryan's guilty plea does not waive this argument. But there are myriad problems with it. For starters, "newly discovered evidence" generally does not, on its own, qualify as fundamental error for *coram nobis* purposes. United States v. Young, No. 23-cr-242 (GMH), 2025 WL 2801226, at *11 (D.D.C. Oct. 2, 2025) (citation omitted). In addition, Ryan's understanding of "newly discovered evidence" is unduly capacious. See Pet. at 11–12. Legal opinions, executive orders, public statements, and press releases that postdate Ryan's criminal proceeding are neither "newly discovered" nor "evidence" in any traditional sense. Cf. United States v. Hall, 324 F.3d 720, 723 (D.C. Cir. 2003) (explaining, in the Federal Rule of Criminal Procedure 33 context, that events and transactions occurring after a trial cannot constitute "newly discovered evidence" justifying a new trial because such events could not have had an impact on the trial's outcome); United States v. Jevric, No. 23-cr-63 (RDM), 2026 WL 1693877, at *7 (D.D.C. June 11, 2026) (looking to cases involving Rule 33 to interpret "newly discovered evidence" in adjudicating a waiver dispute on defendant's collateral attack on his sentence). And any repackaging of previously-available information does not "constitute newly discovered evidence" where such information was "known to the defendant at the time of h[er] proceeding." United States v. Bertram, 209 F. Supp. 3d 243, 249 n.3 (D.D.C. 2016).

More importantly, Ryan's effort to establish fundamental error by way of "newly discovered evidence" runs aground because she points to no evidence that would have even remotely "altered the outcome of the challenged proceeding if it had been known" at the time. Faison, 956 F. Supp. 2d at 271 (citation omitted). In light of this "evidence," she insists that her "charges, plea[,] and sentencing [were] the product of structural error," with "the government

16

advanc[ing] a fabricated narrative while concealing or distorting facts that, if disclosed, would have fundamentally altered the outcome" by "collectively dismantl[ing] the factual and legal basis" for her conviction and "unravel[ing] the falsehoods of the government's original narrative" about her involvement in January 6. Pet. at 10–12.

Little could be further from the truth. Both the prosecution and the Court were well-aware that Ryan did not directly engage in violent conduct and that certain police officers at the Capitol felt it futile to stop the mob of protestors from entering the building. See, e.g., Sent'g Hr'g Tr. at 41:5–44:24. Yet there was overwhelming proof that Ryan decided to join the crowd after seeing the unruly and dangerous direction it had taken, cheering all the way. And as the "undisputed" PSR substantiates, see Pet. at 17, Ryan entered a desecrated Capitol building, with broken windows and security alarms sounding, yelling "USA! USA!" and "in the name of Jesus." See Gov't Sent'g Mem. at 8; Sent'g Hr'g Tr. at 36:17–20 (Ryan's counsel confirming that Ryan chanted and demonstrated in the Capitol). By engaging in this conduct, Ryan clearly "parade[d], demonstrate[d], or picket[ed]" in a "Capitol Building[]" in violation of 40 U.S.C. § 5104(e)(2)(G), which is the offense to which she pled guilty, and none of the "new evidence" she references in Table 1 of her petition suggests otherwise. Perhaps tellingly, Ryan concedes on reply that she "does not seek relief on the theory that she would have proceeded to trial absent the [evidentiary] defects [she] identified" in her petition. Reply Br. at 15. That concession alone dooms her effort to establish fundamental error.

In short, Ryan's purportedly "new evidence" does nothing to weaken the validity of her conviction, let alone demonstrate fundamental error justifying *coram nobis* relief.

17

### 2. Selective Prosecution

Ryan claims that she was selectively prosecuted because of her social media "notoriety," influence, and political speech and profile. Pet. at 14, 34. Even if this claim could survive Ryan's guilty plea under the Menna-Blackledge exception, which is questionable,[6] it stumbles badly out the gate.

The government "retain[s] broad discretion to enforce the Nation's criminal laws." United States v. Armstrong, 517 U.S. 456, 464 (1996) (cleaned up). While the "presumption of regularity" supports the government's charging decisions, id., prosecutors may not make decisions for "reasons forbidden by the Constitution." Id. at 463–64. To establish selective prosecution, a defendant must demonstrate by "clear evidence" that their prosecution "had a discriminatory effect and [] was motivated by a discriminatory purpose." United States v. Baker, No. 24-cr-121 (CRC), 2024 WL 4607684, at *2 (D.D.C. Oct. 25, 2024) (cleaned up) (denying January 6 defendant's motion to dismiss on selective prosecution claim).

Ryan comes nowhere near establishing discriminatory effect or purpose. For one thing, she has not shown that she was prosecuted differently than those who were "similarly situated" to her—i.e., those whose circumstances "present[ed] no distinguishable legitimate prosecutorial factors that might justify different prosecutorial decisions between them." Id. at *3 (cleaned up). Ryan is not "similarly situated" to every other protester who entered the Capitol on January 6 just because they all happened to be present that day. Vague comparisons with no attention to key differences that may have justified different prosecutorial decisions, see, e.g., Pet., Ex. J6, will not suffice to make out a selective prosecution claim—especially when two of Ryan's travel

---

[6] At least one district court in this circuit has found that a defendant's guilty plea had the legal effect of waiving a selective prosecution claim. Bertram, 209 F. Supp. 3d at 249–52.

companions (along with hundreds of other relatively low-level offenders) faced the same misdemeanor charges she did.  Furthermore, one of those companions faced an *additional* count alleging an act of physical violence on Capitol grounds, which only confirms that the prosecutorial decisions here were tailored to individual circumstances.[7]

For another, Ryan has not demonstrated discriminatory motive on government's part—that is, that she was "singled . . . out for prosecution based on an impermissible reason such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights."  United States v. Bennett, No. 21-cr-312 (JEB), 2023 WL 6847013, at *2 (D.D.C. Oct. 17, 2023) (cleaned up).  She alludes in her petition to retaliation for her speech and/or political views.  Yet there are many who gathered and spoke their minds at the Capitol on January 6 but did not breach the building and were not charged, rendering hollow her accusations of political retaliation.  Ryan was charged because of her conduct, not her speech, as the Court repeatedly emphasized during sentencing.  See Sent'g Hr'g Tr. at 32–33, 44–46.  Ryan further suggests that she was targeted for her supposed social-media notoriety and influence.  But, as with the accusation of viewpoint-based retaliation, that is "mere speculation of the Government's improper motivation," which, along with "personal conclusions based on anecdotal evidence," cannot sustain a selective prosecution claim.  Baker, 2024 WL 4607684, at *4 (cleaned up); see also United States v. Navarro, 651 F. Supp. 3d 212, 236–37 (D.D.C. 2023) (holding that "mere speculation" about discriminatory motive related to defendant's public expression of political beliefs is not enough to demonstrate improper animus).  In any case, "social media notoriety" is

---

[7] The Court also observes that Ryan is not similarly situated to those defendants whose cases were still being actively litigated at the time of the January 2025 presidential pardon. Thus, her efforts to draw close comparisons to those defendants, see Pet., Ex. J6, fall flat.

not a legally-cognizable classification against which the selective prosecution doctrine has been understood to guard.[8]

### 3.  *Remaining Arguments*

Ryan's remaining arguments for *coram nobis* relief are likely waived in light of her guilty plea.  By choosing to plead guilty, Ryan avoided the uncertain and potentially bruising impact of standing trial—but she also willingly relinquished the opportunity to challenge most of the issues she newly perceives as legal and factual "error."  That was the deal she (and hundreds of other January 6 defendants) struck.

On the off chance that any of these arguments are *not* waived, however, and in the interests of comprehensiveness and historical accuracy, the Court will tick through Ryan's remaining *coram nobis* arguments, confirming that none would be meritorious even if they were in play.

### a.  Prosecutorial Misconduct

Ryan contends that the government engaged in several flavors of misconduct that fundamentally tainted her conviction and sentence.  She accuses prosecutors of suppressing certain evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United</u>

---

[8] Ryan also alleges that the government engaged in "malicious prosecution."  Pet. at 15. Malicious prosecution is a civil tort and therefore not applicable in this criminal proceeding.  <u>See</u> <u>Pitt v. District of Columbia</u>, 491 F.3d 494, 501 (D.C. Cir. 2007).  On the government's read of the petition, Ryan might have meant instead to allege vindictive prosecution.  Even if that were the case, such an accusation would be a non-starter.  To succeed on a vindictive prosecution claim, the defendant must point to an increased charge brought *solely* in order to penalize her for exercising some legal right and "could not be justified as a proper exercise of prosecutorial discretion."  <u>United States v. Slatten</u>, 865 F.3d 767, 799 (D.C. Cir. 2017) (citation omitted).  Not only did Ryan's charges remain constant until her guilty plea (when most were dismissed in their entirety), there is also simply no evidence that the government sought to retaliate against Ryan solely for exercising some legal right.  Vindictive prosecution is "exceedingly difficult" to demonstrate under the best of circumstances, <u>United States v. Meadows</u>, 867 F.3d 1305, 1311 (D.C. Cir. 2017) (citations omitted); those here certainly don't suffice.

States, 405 U.S. 150 (1972).  She also insists that prosecutors fabricated evidence and distorted the narrative as to what happened on January 6, which she styles as an infringement on her due process rights.  As with newly discovered evidence, even prejudicial misconduct does not necessarily rise to the level of fundamental error.  Young, 2025 WL 2801226, at *11.  And here, there was no demonstrable misconduct and certainly no prejudicial misconduct, let alone fundamental error warranting *coram nobis* correction.

*First*, take Ryan's allegations of improper suppression of exculpatory, impeachment, mitigating, and "systemic" evidence.  See Pet. at 19–22.  All four charges are unfounded, but the Court takes the latter three first.  The government was not required to disclose impeachment evidence before entering a plea agreement with Ryan.  See United States v. Ruiz, 536 U.S. 622, 633 (2002).  Nor did the government "suppress" mitigating evidence of Ryan's remorse or desire to cooperate; the topics were subject to active debate at the hearing.  (It goes without saying that the PSR recommendation could not possibly have been "suppressed," as Ryan suggests, see Pet. at 21; it was not the prosecution's to produce and was, in any event, filed on the case docket.)  And Ryan's suggestion that the government was required under Brady or its progeny to disclose charging policies, internal memos, and comparative sentencing data misapprehends the government's disclosure obligations.

Ryan also posits that undisclosed CCTV footage purporting to show Capitol police officers letting individuals into the east door of the Rotunda is exculpatory because it negates her *mens rea*.  See Pet. at 19; see also Pet., Ex. A.  Another misfire.  For one thing, Ryan's assertion that the CCTV footage was "withheld" is speculative and conclusory; even if *she* hadn't

personally seen the video until last year does not mean it was not made available.[9]  Without more, there is no *bona fide* basis for her accusation of withholding.  For another, Ryan does not explain how this footage bears at all on the parading, demonstrating, or picketing offense to which she pled guilty; nothing in the video undermines that she did as much, and in fact, she does not even appear in the footage.  And even if the video were relevant to Ryan's offense, there was overwhelming evidence that she knew at the time that she and her fellow protestors lacked permission to enter the Capitol.  Perhaps that is why, as noted above, she quite quickly expressed interest in a plea deal—a fact which only confirms that there is no "reasonable probability that, had [the video footage] been disclosed to the defense, the result of the proceeding would have been different."  United States v. Sitzmann, 893 F.3d 811, 826 (D.C. Cir. 2018) (citation omitted).  If there is no reasonable probability of a different outcome (here, a guilty plea), there can have been no prejudice to Ryan even if the government can somehow be understood to have "willfully or inadvertently" suppressed "exculpatory" evidence (which, again, Ryan has not established).  Id.; see also United States v. Celis, 608 F.3d 818, 837 (D.C. Cir. 2010) (explaining that if the government's evidence against a defendant is "overwhelming," a failure to disclose other evidence is unlikely to be material).

*Second*, Ryan accuses the government of fabricating various pieces of evidence during the sentencing process and decontextualizing or misrepresenting others, in violation of her due process rights.  See Pet. at 22–24.  She points, for instance, to the government's suggestion that

---

[9] The Court notes that prior to 2025, the federal government—under the procedural guidance of this Court's Standing Order 21-28 (May 14, 2021)—made thousands of video exhibits and other judicial records from the January 6 Capitol attack cases publicly available on the USAfx platform.  See Mot. to Enforce Standing Order 21-28, ECF No. 9, In re Press and Public Access to Video Exhibits in the Capitol Riot Cases, 21-mc-46 (JEB).

she engaged in violent chants and declared that she would face no consequences for her participation in the riot.  See Pet. at 22–23.

Ryan's accusation falls flat on the facts and the law.  As a preliminary matter, she admits making many of the cited statements, so those are not "fabricated."  Id. at 24.  As to any cited statements she insists she did *not* make, her say-so is not evidence that the government engaged in fabrication.[10]  Furthermore, to the extent Ryan takes issue with evidence that was not directly substantiated at the sentencing hearing, she both misunderstands the evidentiary burden at the sentencing stage and ignores that the Court's sentence was not based on unverified or constitutionally-defective information.  Rather, it was based on the PSR findings, the Statement of Offense, and other video footage and posts that Ryan either agreed to at the time or has not meaningfully challenged since.  There was a mountain of conceded evidence that Ryan committed the offense she pled guilty to, cheered on the Capitol attack, and was not as remorseful as she now insists she was.  Her proposed narrative of January 6—which has her simply "enter[ing]" the building "peacefully" and "le[aving] voluntarily after two minutes," Pet. at 14—minimizes the context of her actions and conveniently omits *any* reference to the overwhelming proof of her unlawful conduct.[11]

_____

[10] At sentencing, the Court asked the government whether Ryan joined in one of the crowd's chants to "Hang Mike Pence," as the Court had "looked for that in the video and did not see it."  Sent'g Hr'g Tr. at 17:3–5.  Government counsel represented that, according to her "recollection," Ryan had joined in the chant, but she would not "rule out the fact that [she] could have misinterpreted or misheard."  Id. at 17:6–10.  Ultimately, she stressed to the Court that "the video should speak for itself."  Id. at 17:10.  This exchange obviously does not suggest that the government fabricated evidence wholesale.

[11] To the extent Ryan now complains about her inability to "test[]" certain "factual predicates," Reply Br. at 17, that is precisely the opportunity she relinquished by pleading guilty.  See, e.g., Plea Hr'g Tr. at 5:20–6:9 ("[THE COURT:] Ms. Ryan, as I'm sure Mr. Womack has gone over with you . . ., there are a number of rights that you will be giving up if I accept a guilty plea from you this morning.  Most importantly you would have the right to trial . . . You would be able to testify on your own behalf.  Mr. Womack would be able to call witnesses on your

The bottom line is this:  Just because Ryan contests the government's characterization of the events of January 6 and her involvement does not mean that the government violated her due process rights.  To be sure, "courts must be concerned not merely when a sentencing judge has relied on demonstrably false information, but when the sentencing process created a significant *possibility* that misinformation infected the decision."  United States v. Lemon, 723 F.2d 922, 933 (D.C. Cir. 1983) (cleaned up).  But "due process requires only that *some* evidentiary basis beyond mere allegations support the sentencing court's findings, . . . and that sentences not be imposed on the basis of misinformation of constitutional magnitude."  United States v. Chaikin, 960 F.2d 171, 174 (D.C. Cir. 1992) (cleaned up).  No matter how vehemently Ryan disagrees, the government's narrative of events did not hinge on any such "misinformation."  There is no meaningful dispute about the core facts underpinning Ryan's conviction and sentence, simply "a dispute about the right way to characterize" them.  United States v. Turner, 864 F.2d 1394, 1400 (7th Cir. 1989).  Such a quibble does not reveal any deprivation of due process at the hands of the government, let alone one so fundamental as to warrant *coram nobis* relief.

b.  Sentencing and Judicial Bias

Ryan accuses not only the government of impropriety, but also the Court.  She contends that her sentence was "[n]on-[i]ndividualized," resting on factors and circumstances that sentencing courts are not meant to consider, and reflected judicial bias.  Pet. at 30.  These contentions are entirely without merit.

---

behalf as well as to cross-examine the government's witnesses.  But by pleading guilty you would be giving up that trial right.  Do you understand that?  THE DEFENDANT: Yes.  THE COURT: And you're still willing to proceed?  THE DEFENDANT: I am.").  A writ of error *coram nobis* is an extraordinary remedy for correcting errors that fundamentally tainted criminal proceedings, not a vehicle for relitigating legal and factual issues that have already been put to rest.

24

The Court addresses Ryan's allegations of judicial bias more fulsomely in a companion order denying her motion for recusal. See Order on Mot. for Recusal. Here, it suffices to say that Ryan does not offer evidence of actual bias "but instead merely *infer[s]* bias from unfavorable judicial rulings," including the sentence she received and the Court's observations from the bench in separate January 6 matters. Perkins Coie LLP v. DOJ, 775 F. Supp. 3d 431, 436 (D.D.C. 2025) (citing Rafferty v. NYNEX Corp., 60 F.3d 844, 848 (D.C. Cir. 1995)). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" to demonstrate bias. Liteky v. United States, 510 U.S. 540, 555 (1994). "[J]udicial remarks during the course" of a proceeding "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id. Ryan points to no evidence to suggest that the undersigned harbors any "favoritism or antagonism that would [have] ma[d]e fair judgment impossible" in her case. Id. The Court's statements in this and many other January 6 criminal proceedings properly (and accurately) "reflect[] what [the Court] learned" in the years since the attack. Perkins Coie LLP, 775 F. Supp. 3d 431, 438 (quoting United States v. Microsoft Corp., 253 F.3d 34, 115 (D.C. Cir. 2001) (en banc) (per curiam)).

Ryan also fails to identify fundamental error in the Court's sentencing decision. As the Supreme Court has "long recognized," "sentencing judges exercise a wide discretion in the types of evidence they may consider when imposing [a] sentence," and are empowered to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." Pepper v. United States, 562 U.S. 476, 480 (2011) (cleaned up); see also 18 U.S.C. § 3553(a).

Ryan's assertion that the Court did not sentence her "based on the facts of her misdemeanor offense," but instead on her notoriety and the conduct of other protestors, is absurd. Pet. at 30. In accordance with 18 U.S.C. § 3553(a), and drawing on the accepted PSR findings, the Court *began* by outlining the "nature and seriousness" of her specific offense, carefully differentiating Ryan from those who led the attack, acted violently, carried weapons, or made their way to the Senate floor. Sent'g Hr'g Tr. at 41:5–23. The Court observed that Ryan decided to join the action *after* seeing, on the news, that the rallies at the Capitol had turned violent. She entered the building despite tear gas and fire alarms blaring upon her arrival. The Court acknowledged that Ryan did not directly engage in violent conduct and that she walked by a police officer who didn't try to stop her entry. But Ryan also celebrated the riot. She announced on social media that she was going to "storm the Capitol." Stmt. of Offense ¶ 3. She described the event as "going to war." Sent'g Hr'g Tr. at 43:4–6. A social media video captured her saying, as she entered the Rotunda, that she was going in, "[l]ife or death, it doesn't matter, here we go." Gov't Sent'g Mem. at 2.[12] Upon leaving the Rotunda, she posted a picture next to a broken window, accompanied by ominous commentary that she and her companions would "come after" the news studios next if they didn't "stop lying." Id. In short, Ryan applauded the violence and egged on destruction of property at the Capitol on January 6.

The Court then turned to the other statutorily-mandated sentencing factors, which include both the "history and characteristics of the defendant" and the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (a)(2)(B). The Court recognized Ryan's challenging upbringing and professional successes. It also observed that Ryan's statements and media appearances immediately after January 6

---

[12] The PSR—which Ryan, again, does not dispute—corroborates the content of this post.

26

undercut the notion that she was fully remorseful, including her description of the prosecution as a "witch hunt." Sent'g Hr'g Tr. at 47:2–12. Turning finally to the "need for general deterrence," which—again—is a factor that must be considered by law, the Court observed that Ryan had become a public face of the "January 6th incident." Id. at 48:25–49:2. Balancing the need to ensure that something like the attack would never happen again against the nature and extent of Ryan's conduct on the day, the Court came to the conclusion that a sixty-day prison sentence— four months below the statutory maximum—was appropriate.[13] Id. at 50:8–14.

Ryan has tried to re-cast the Court's straightforward § 3553(a) analysis as unfounded and unjust. It was neither. The sentence was calibrated based on the nature and seriousness of the offense, Ryan's post-January 6 conduct, and the need to deter future criminal activity of the kind in which she engaged. And again, the fact that Ryan may have received a longer sentence than some other January 6 defendants—though shorter than many others—"does not [by itself] support a finding of discriminatory animus" or structural invalidity, as "[s]entencing disparities across federal cases arise from individual assessments involving distinct facts" and "judicial

---

[13] Ryan also posits that the Court's sentence was intended to punish her for her speech. See Pet. at 30–32. The Court repeatedly reiterated that Ryan was being punished for her conduct rather than her speech. See Sent'g Hr'g Tr. at 44:25–45:8. In any case, as the Supreme Court and D.C. Circuit have made clear, "the Constitution does not prevent a sentencing court from considering . . . ostensibly First Amendment-protected activity" so long as it is genuinely "relevant to determining an appropriate sentence." United States v. Williamson, 903 F.3d 124, 136 (D.C. Cir. 2018). Ryan's recalcitrant statements on and after January 6 are relevant to sentencing insofar as they reflect her mindset at the time, her lack of remorse after the event, and the need for deterrence of similar criminal activity in the future. Comments describing January 6 as the "best day" of Ryan's "life" and maintaining after the attack that she "did nothing wrong" are exactly the type of expressions that, in context, bear on her sentencing proceedings. Cf. United States v. Brown, 26 F.4th 48, 67 (1st Cir. 2022) (explaining that "[p]rotected" First Amendment "conduct may . . . become relevant to evaluate a defendant's remorse, likelihood of reoffending, or the extent of punishment needed for deterrence"). At the sentencing hearing, Ryan's own counsel conceded that the Court could consider her statements "for purposes of sentencing" vis-à-vis "deterrence and acceptance of responsibility and true remorse and respect for the law." Sent'g Hr'g Tr. at 32:20–33:6.

discretion." <u>Am. First Legal Found. v. DOJ</u>, 805 F. Supp. 3d 187, 205 (D.D.C. 2025).  With no hint of impropriety in the Court's broadly discretionary sentencing decision, Ryan staggers under her burden to demonstrate fundamental error.

## IV.  Conclusion

Jenna Ryan broke the law on January 6, formally owned up to her criminal conduct, and served a very brief jail term as a consequence.  Her involvement in the events of January 6 is clear.  The validity of her prosecution and sentencing is unassailable.  Fortunately for her, there are some who wish to rewrite the history of that day, and that desire resulted in her pardon.  But rather than accept manna from heaven and move on, Ryan seeks to erase her participation in the Capitol riot from the judicial record.  Her request must be rejected.  Ryan relinquished most of her grievances by voluntarily pleading guilty.  And waiver aside, the vehicle she pursues—an extraordinary writ of error *coram nobis*—"does not rewrite history."  <u>United States v. Bush</u>, 888 F.2d 1145, 1149 (7th Cir. 1989).  The Court thus declines to adopt Ryan's whitewashed version of her involvement in the events of January 6 and their aftermath.  The truth is that she was prosecuted aggressively but fairly; extended rights to counsel and due process in all proceedings; and sentenced fully within the bounds of the law.  The "fundamental promise" that litigants deserve fair and impartial adjudication of their claims for relief "does not entitle *any* party . . . to demand adherence to their own version of the facts and preferred legal outcome."  <u>Perkins Coie LLP</u>, 775 F. Supp. 3d at 433.

For the foregoing reasons, the Court will **DENY** Defendant's petition for a writ of error *coram nobis*.  A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>July 17, 2026</u>